950 F.2d 1437
 60 USLW 2443
 Annise FULLER, Roshaun Fuller, Plaintiffs-Appellants,
v.
M.G. JEWELRY, Pravis Kashanian, Officer Liggett, Officer
Parga, Officer Barham, City of Los Angeles, County
of Los Angeles, Defendants-Appellees.
 No. 89-55710.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Oct. 1, 1990.
Decided Dec. 11, 1991.
 
 Edward M. Fox, Klass, Helman & Ross, Los Angeles, Cal., for plaintiffs-appellants.
 Richard W. Helgeson, Deputy City Atty., Los Angeles, Cal., for defendants-appellees.
 Appeal from the United States District Court for the Central District of California.
 Before PREGERSON, REINHARDT and HALL, Circuit Judges.
 PREGERSON, Circuit Judge:
 
 
 1
 Plaintiffs-Appellants Annise and Roshaun Fuller were arrested on suspicion of grand theft of a ring from M.G. Jewelry. Pursuant to their arrest, the Fullers were subjected to strip and visual body cavity searches, which revealed no evidence of any crime. No charges were ever filed against them.
 
 
 2
 As a result of the arrest and searches, the Fullers brought a civil rights action under 42 U.S.C. § 1983 against the County of Los Angeles, the City of Los Angeles, and three individual police officers. The district court granted summary judgment against the Fullers. The court concluded that probable cause existed to arrest and strip search the Fullers, and that, in any event, the officers were entitled to qualified immunity. The district court also denied the Fullers' motion for reconsideration.
 
 
 3
 The Fullers appeal both the grant of summary judgment and the denial of their motion for reconsideration. We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.
 
 BACKGROUND
 
 4
 On February 21, 1987, Annise Fuller, her daughter Roshaun, and a companion named Helen Allen entered M.G. Jewelry Store to return an item for repair. According to Appellee Pravis Kashanian, the jewelry merchant, Annise asked to see a ring ("ring No. 1") from the display case, which she examined and passed to Roshaun and Allen. Allen then asked to see another ring (ring No. 2"), which she admired and passed to Annise. Kashanian reported that while Annise placed ring No. 2 on her finger, she held ring No. 1 in her hand. Allen eventually decided to put down a $20 deposit on ring No. 2 for lay-away.
 
 
 5
 The three women then left the store and continued shopping. According to the Fullers, they later returned to the area near the jewelry store to eat. Meanwhile, Kashanian noticed ring No. 1 was missing and determined to his satisfaction that no one else in the store had it. Believing the Fullers had stolen the ring, Kashanian contends he approached the women, who were then across the street from M.G. Jewelry, and asked Annise to return to the store. According to Kashanian, Annise became nervous and attempted to walk away, but he grabbed her wrist. A struggle ensued between Kashanian, Annise, and Roshaun. Annise maintains that Kashanian pushed her into a nearby restaurant (Kashanian reported that Annise ran into the restaurant herself), demanded that she open her purse, then grabbed her purse and ran out. Annise says she then went to the bathroom to wipe her face, which had been injured, while Roshaun ran after Kashanian.
 
 
 6
 A witness who was in the bathroom when Annise entered told police that Annise ran to the front of the line and asked everyone to leave because she had to throw up. The witness reported Annise appeared to be choking and gagging to make herself throw up. Although only one bathroom stall was operational and approximately ten women were in line, they refused to relinquish the stall to Annise. Annise left the bathroom momentarily, then returned and repeated her request. Her plea was ignored once again, but the witness reported that she seemed to get better and left.
 
 
 7
 Los Angeles Police Officers Liggett, Parga, and Barham arrived at the scene and interviewed Kashanian, who reported that the Fullers had stolen a ring valued at $800. The officers also spoke with a store employee named Ms. Barberena, with the unnamed rest room witness, with Allen, and with the Fullers, who denied they took anything. Officer Judy Barham conducted a pat down search of the three women. She also searched their purses, and conducted a thorough search of the restaurant, including the trash cans, bathroom stalls, commodes, sinks and sink drains. Although no ring was ever found, Annise and Roshaun were arrested and booked for grand theft.
 
 
 8
 After their arrest, Annise and Roshaun were transported to the Los Angeles Police Department ("LAPD") central station and subjected to a strip and visual body cavity search. Officer Barham took Annise into the bathroom, made her undress, searched her clothing, and then visually inspected Annise's vagina and rectum. Barham conducted a similar search of Roshaun.[1] Barham also searched the toilet after Roshaun had used it. Annise was then transported to the hospital for an x-ray. None of the searches revealed any drugs, weapons, or stolen items.
 
 
 9
 At the time the searches were conducted, the LAPD followed a policy that required strip and body cavity searches of all felony arrestees, regardless of the crime with which they were charged.[2]
 
 
 10
 The Fullers were eventually transported to the Los Angeles County Sybil Brand Institute women's jail, where they were booked and subjected to a second strip search by Los Angeles County Sheriff's Department personnel. The Fullers remained incarcerated for twelve hours before they were released on bail. No charges were ever filed against them.
 
 
 11
 The Fullers brought this action under 42 U.S.C. § 1983 against the County of Los Angeles, the City of Los Angeles, and the three police officers based on their arrest and subsequent strip searches. They alleged, among other things, that the arrest and the searches conducted by LAPD officers and Sheriff's Department personnel violated their rights under the Fourth and Fourteenth Amendments. Before trial, the Fullers filed motions for summary judgment against the County, City, and police officers on the issue of liability. All of the defendants filed counter motions for summary judgment.
 
 
 12
 On March 8, 1989, the district court granted the summary judgment counter motion brought by both the City and the police officers (hereafter, "Appellees") and dismissed the action against those defendants on the merits.[3] The court concluded that the police officers "had reasonable cause to arrest plaintiffs for grand theft of the missing ring." The court also determined that the officers had "reasonable cause or suspicion to justify a full body cavity search incident to arrest and booking." The court found that even if no probable cause existed for the search, the officers were entitled to qualified immunity because it was not clearly established at the time of arrest that such a search would be unconstitutional.
 
 
 13
 Finally, the court concluded that under Monell v. Department of Social Services, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978), the City of Los Angeles could not be held liable because the officers had not violated any of the Fullers' constitutional rights. The court determined that the City's policy regarding strip searches of felony arrestees in other circumstances was irrelevant, because "the search here was not unconstitutional."
 
 
 14
 The Fullers then filed a motion for reconsideration. On June 8, 1989, the district court denied the motion, dismissed private party defendants M.G. Jewelry and Kashanian, and ordered certification pursuant to Fed.R.Civ.P. 54(b) to establish an appealable final judgment. On June 15, 1989, the Fullers appealed the granting of summary judgment in favor of the City and police officers and the denial of their motion for reconsideration.
 
 
 15
 After the Fullers filed their notice of appeal, Appellees brought a motion to dismiss based on a variety of jurisdictional grounds. Appellees asserted that the district court's Rule 54(b) certification was invalid because the court failed to make any specific findings as to why there was "no just reason for delay." Appellees also argued that the Fullers' appeal was premature because the district court never entered judgment on its order on a separate document as required by Fed.R.Civ.P. 58. Finally, Appellees maintained that even if the parties could be deemed to have waived the separate document requirement, the Fullers' appeal of the summary judgment order was untimely under Federal Rules of Appellate Procedure 4(a). A motions panel of this court denied Appellees' motion and granted them leave to file a late appellees' brief.
 
 STANDARD OF REVIEW
 
 16
 A district court's denial of a motion for reconsideration under Fed.R.Civ.P. 59(e) is construed as a denial of relief under Fed.R.Civ.P. 60(b). As such, it will not be reversed absent an abuse of discretion. Fiester v. Turner, 783 F.2d 1474, 1475-76 (9th Cir.1986).
 
 
 17
 We review the district court's grant of summary judgment in favor of the City and officers de novo. Kruso v. International Telephone & Telegraph Corp., 872 F.2d 1416, 1421 (9th Cir.1989). We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact, and whether the district court correctly applied the relevant substantive law. Tzung v. State Farm Fire and Casualty Co., 873 F.2d 1338, 1339-40 (9th Cir.1989); Judie v. Hamilton, 872 F.2d 919, 920 (9th Cir.1989).
 
 DISCUSSION
 I. Jurisdiction
 
 18
 While we give deference to motions panel decisions made in the course of the same appeal, we have an independent duty to decide whether we have jurisdiction. Schlegel v. Bebout, 841 F.2d 937, 941 (9th Cir.1988). In this case, we agree with the motions panel ruling.
 
 
 19
 The district court's Rule 54(b) certification order does not amount to a jurisdictional defect simply because the court did not include specific findings regarding the appropriateness of the certification. See Rutman Wine Co. v. E. & J. Gallo Winery, 829 F.2d 729, 732 n. 1 (9th Cir.1987). While a separately entered judgment is not a prerequisite to appellate jurisdiction, such a judgment is in any case waived where, as here, parties fail to timely object to the appeal on that ground. Allah v. Superior Court, 871 F.2d 887, 890 and n. 1 (9th Cir.1989).[4]
 
 II. The Motion For Reconsideration
 
 20
 On May 15, 1989, two months after the district court issued its summary judgment order, the Fullers brought a motion for reconsideration "under the local rules," claiming that neither party addressed the issue of probable cause, and that there was a " 'manifest showing ... of a failure to consider material facts' " regarding the Fullers' arrest.[5] The district court denied the motion without stating its reasons.
 
 
 21
 Although the Fullers never indicated which Federal Rule of Civil Procedure governed their motion, a motion for reconsideration of summary judgment is appropriately brought under either Rule 59(e) or Rule 60(b). Taylor v. Knapp, 871 F.2d 803, 805 (9th Cir.1989), cert. denied, 493 U.S. 868, 110 S.Ct. 192, 107 L.Ed.2d 146 (1989).
 
 
 22
 Treating the motion for reconsideration as one brought under Rule 59(e), the trial court did not abuse its discretion in denying the motion, because the Fullers presented no arguments which the court had not already considered and rejected. See Taylor at 805. While it is true that the Fullers did not specifically address the issue of probable cause in their original opposition to Appellees' summary judgment motion, their discussion of the qualified immunity doctrine, as explained below, covered the same factual issues.
 
 
 23
 The motion was also properly denied if brought pursuant to Rule 60(b), which provides for reconsideration only upon a showing of (1) mistake, surprise, or excusable neglect; (2) newly discovered evidence; (3) fraud; (4) a void judgment; (5) a satisfied or discharged judgment; or (6) "extraordinary circumstances" which would justify relief. Fed.R.Civ.P. 60(b); Backlund v. Barnhart, 778 F.2d 1386, 1388 (9th Cir.1985). None of these factors was present in this case.
 
 
 24
 III. Summary Judgment on the Warrantless Arrest Issue
 
 
 25
 In making the decision to arrest and search the Fullers, the LAPD officers relied heavily on Kashanian's report that Roshaun and Annise had stolen the ring. The Fullers argue that Kashanian's report alone was insufficient to establish probable cause, and that the officers had a duty to investigate further before arresting them. They emphasize that Kashanian never said he actually saw them take the ring, and that he testified at his deposition that he told police he merely "had a feeling" the Fullers had stolen it. The Fullers also maintain there is no evidence that Roshaun ever touched the ring. Finally, the Fullers argue that the officers should have made further inquiry before arresting them without a warrant.
 
 
 26
 The Fullers cite various discrepancies between Kashanian's report to the police and his deposition testimony, including the fact that:
 
 
 27
 1) The report only mentions two rings, while Kashanian testified that three rings were involved.
 
 
 28
 2) The report indicates that Allen requested ring No. 2 and made a deposit on it, while Kashanian testified that Annise made the request.
 
 
 29
 3) While the report indicates that Kashanian was the last person to deal with the Fullers before they left, Kashanian later testified that the owner, "M.G.," was the last person to have contact with them.
 
 
 30
 The Fullers argue that these discrepancies amount to genuine issues of material fact regarding the existence of probable cause and qualified immunity that must be resolved by a jury, thereby precluding summary judgment.
 
 
 31
 We conclude that the district court properly granted summary judgment in favor of Appellees on the arrest issue. We do not reach the question whether the officers had probable cause to arrest because we hold that they were entitled to qualified immunity with respect to that issue.
 
 
 32
 Government officials performing discretionary functions are entitled to qualified immunity from damages if their conduct does not violate " 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " Thorsted v. Kelly, 858 F.2d 571, 573 (9th Cir.1988), quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The doctrine of qualified immunity does not require that probable cause to arrest exist. Even absent probable cause, qualified immunity is available if a reasonable police officer could have believed that his or her conduct was lawful, in light of clearly established law and the information the searching officers possessed. Anderson v. Creighton, 483 U.S. 635, 641, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).
 
 
 33
 Thus, even if the officers were mistaken that probable cause to arrest the Fullers existed, they are nonetheless immune from liability if their mistake was reasonable.[6] Anderson, 483 U.S. at 641, 107 S.Ct. at 3039. The critical inquiry before us, therefore, is whether a reasonable police officer could have believed that his or her conduct was lawful, in light of clearly established law and the information he or she possessed at the time. Id.
 
 
 34
 The purpose of qualified immunity is to "avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). We have previously held that on a motion for summary judgment, where the evidence is undisputed, a district court may establish that a defendant is entitled to qualified immunity as a matter of law. See Thorsted v. Kelly, 858 F.2d 571, 575 (9th Cir.1988). However, "when there are triable issues of fact of a reasonable belief that a search is lawful, viewed in light of the settled nature of the law, these issues are for the jury." Id. at 575. See also Bilbrey v. Brown, 738 F.2d 1462, 1467 (9th Cir.1984).
 
 
 35
 Here the material facts are not in dispute.[7] The officers were told by Kashanian that the Fullers had handled the missing ring before leaving the store and that no one else in the store had the ring. In addition, they learned from the woman in the rest room that Annise Fuller had run into the rest room and asked everyone to exit, and that she appeared to be attempting to make herself throw up--conduct consistent with an attempt to dispose of the ring.
 
 
 36
 In support of their argument that the officers should have conducted a further investigation, the Fullers cite Merriman v. Walton, 856 F.2d 1333 (9th Cir.1988), cert. denied, 491 U.S. 905, 109 S.Ct. 3188, 105 L.Ed.2d 696 (1989), in which we concluded that police officers had a duty to inquire further before arresting an individual for kidnapping. The arrestee, Scott Merriman, brought a civil rights action after police arrested him, without a warrant, for kidnapping his girlfriend, Wendy. The arresting officer acted on a report by Wendy's half-brother that Wendy might have been kidnapped. The brother told police he had received a phone call from a friend of Wendy's who had seen Merriman force Wendy into his car. At the time of the arrest, Wendy had returned home, but the officer had not interviewed her. Merriman himself had contacted and cooperated with the police.
 
 
 37
 The arresting officer brought a motion for summary judgment on the grounds that he was entitled to qualified immunity as a matter of law. The district court denied the motion, and on appeal, we affirmed. We concluded that the officer was not entitled to qualified immunity because a "reasonable police officer would have made further inquiry before effecting a warrantless arrest." Id. at 1335. See also Hutchinson v. Grant, 796 F.2d 288 (9th Cir.1986) (police officer who mistook arrestee for a burglary suspect with the same name was not entitled to summary judgment in connection with arrest where he took no steps to verify the arrestee's identity before arresting him).
 
 
 38
 The Fullers argue that the police officers in this case should have made further inquiry before arresting them. Specifically, the Fullers contend that the officers should have interviewed "M.G.," the jewelry store owner who was, according to the Fullers, the last person to see Annise Fuller with the ring.[8]
 
 
 39
 Appellees contend that a reasonable police officer need not have made any further inquiry before arresting the Fullers, because officers are entitled to rely on detailed reports by honest citizens such as Kashanian in determining whether probable cause to arrest exists. See Illinois v. Gates, 462 U.S. 213, 233-34, 103 S.Ct. 2317, 2329-30, 76 L.Ed.2d 527 (1983). Appellees also emphasize that "information coming from private citizens who are witnesses to or victims of a criminal act is presumed reliable" under California law, see People v. Kershaw, 147 Cal.App.3d 750, 755, 195 Cal.Rptr. 311 (1983), and that where, as here, the citizen informant is the victim of the crime in question, the report is entitled to even greater weight. See, e.g., Adams v. Williams, 407 U.S. 143, 147, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972). This is especially true, Appellees argue, because if Kashanian's report had been false, he would have been subject to criminal liability. See Cal.Penal Code 148.5(a).
 
 
 40
 We decline to adopt Appellees' argument that merely because citizen witnesses are presumptively reliable, the officers in this situation had no duty to examine further the basis of the witness' knowledge or talk with any other witnesses. We agree with the California Supreme Court that the general proposition that private citizen witnesses or crime victims are presumed reliable does not "dispense with the requirement that the informant ... furnish underlying facts sufficiently detailed to cause a reasonable person to believe a crime had been committed and the named suspect was the perpetrator." People v. Ramey, 16 Cal.3d 263, 269, 127 Cal.Rptr. 629, 545 P.2d 1333 (1976), cert. denied, 429 U.S. 929, 97 S.Ct. 335, 50 L.Ed.2d 299 (1976).
 
 
 41
 Nevertheless, in this case the officers did not rely solely on the uncorroborated testimony of a citizen witness before arresting the Fullers. After interviewing Kashanian, the officers investigated further by questioning: (1) a second store employee, who confirmed that the Fullers were the last people to be seen with the ring; (2) the witness who allegedly saw Annise attempting to vomit in the rest room; and (3) the Fullers and their companion.
 
 
 42
 Thus, while we agree with the Fullers that the police officers had a duty to conduct an investigation into the basis of the witness' report, see Merriman, 856 F.2d at 1335, we hold that the officers conducted a sufficient investigation here. Based on all of the information they obtained, the officers could have reasonably believed that there was probable cause to arrest the Fullers. Accordingly, the officers were entitled to qualified immunity for the arrest.
 
 
 43
 IV. Summary Judgment On The Visual Body Cavity Inspection Issue
 
 
 44
 The Fullers maintain that the strip and body cavity searches conducted by Officer Barham at the LAPD central station violated the Fourth Amendment's prohibition of unreasonable searches. They contend that the searches were conducted pursuant to the LAPD's blanket policy then in effect which required a routine strip and body cavity search of all felony arrestees. Appellees argue that the searches were legal because they were conducted pursuant to a lawful arrest, and were justified by the officer's individualized suspicion that the Fullers were harboring contraband--that is, a stolen ring.
 
 
 45
 As we have previously observed, "[t]he intrusiveness of a body cavity search cannot be overstated." Kennedy v. Los Angeles Police Dept., 901 F.2d 702, 711 (9th Cir.1989). Strip searches that involve the visual exploration of body cavities are "dehumanizing and humiliating." Id. In Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), the landmark case dealing with strip searches of prison inmates, Justice Marshall commented that visual body cavity searches "represent one of the most grievous offenses against personal dignity and common decency." Id. at 576-77, 99 S.Ct. at 1893 (Marshall, J., dissenting). See also Mary Beth G. v. City of Chicago, 723 F.2d 1263, 1272 (7th Cir.1983) (finding few exercises of state authority that intrude on citizens' privacy and dignity as severely as visual anal and genital searches). With these observations in mind, we turn to the question of the constitutionality of the visual body cavity searches performed by LAPD Officer Judy Barham on Annise and Roshaun Fuller.
 
 A. The LAPD Strip Search Policy
 
 46
 In Bell v. Wolfish, 441 U.S. 520, 561, 99 S.Ct. 1861, 1885, 60 L.Ed.2d 447 (1979), the Supreme Court held that strip and visual body cavity searches may, in certain instances, be conducted on prisoners and pretrial detainees in institutional settings with less than probable cause. In determining whether an institutional search policy is reasonable under the Fourth Amendment, a court must balance "the need for the particular search against the invasion of personal rights that the search entails." Id. at 559, 99 S.Ct. at 1884. In each case, a court must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted. Id.
 
 
 47
 In Kennedy v. Los Angeles Police Dept., 901 F.2d 702 (9th Cir.1990) (as amended), we applied the Wolfish test to the LAPD's blanket policy of performing strip and body cavity searches on all felony arrestees, and found the policy unconstitutional. The plaintiff in the case, Karen Kennedy, was arrested for grand theft after a dispute with her roommate over possession of a television set, which Kennedy intended to hold as security for money the roommate owed her. After her arrest, Kennedy was taken to jail and forced to submit to a body cavity search pursuant to the LAPD strip search policy.
 
 
 48
 Kennedy later brought a civil rights action against the LAPD and two of its officers. The jury determined that the department's strip search policy violated Kennedy's constitutional rights, and awarded Kennedy damages. In addition, United States District Judge Stephen V. Wilson held that the policy of conducting a visual body cavity search of all felony arrestees, regardless of any reasonable suspicion, violated the Fourth Amendment. Kennedy v. Los Angeles Police Dept., 667 F.Supp. 697 (C.D.Cal.1987).
 
 
 49
 On appeal, we affirmed, and held that the blanket policy could not withstand constitutional review under Wolfish. Judge Hall, writing for our court, emphasized that visual body cavity searches are "dehumanizing and humiliating," and that their intrusiveness "cannot be overstated." Kennedy, 901 F.2d at 711. In light of the intrusiveness of such searches, we concluded that the LAPD failed to offer any serious justification for routinely performing them on all felony arrestees; instead, the LAPD relied on "improper assumptions and societal judgments" about individuals who have been arrested. Id. at 713. We noted, however, that a body cavity search could be justified where officials had "reasonable suspicion" to conduct a particular search. Id. at 715.
 
 
 50
 Applying Kennedy, it is clear that the visual body cavity inspection cannot be justified based on the blanket strip-search policy. However, this does not end our inquiry. As we observed in Kennedy, "a search, although not supportable under an institutional policy, is not per se unconstitutional." 901 F.2d at 702. The fundamental question under the fourth amendment is whether "the grounds for a search ... satisfy objective standards" of reasonableness. Torres v. Commonwealth of Puerto Rico, 442 U.S. 465, 471, 99 S.Ct. 2425, 2429, 61 L.Ed.2d 1 (1979) (emphasis added). Quite apart from the blanket policy, the appellees offer two justifications for the visual body cavity inspection. First, appellees argue that the inspection was authorized as a search incident to arrest. See United States v. Robinson, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973). Second, appellees maintain that the search was justified by the officer's "individual suspicion" that the arrestees were hiding the missing ring in a body cavity. We examine each of these rationales in turn.
 
 B. Search Incident To Arrest
 
 51
 In Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), the Supreme Court ruled that a police officer may lawfully search an individual incident to a lawful arrest to discover and seize the fruits or evidence of crime. In United States v. Robinson, 414 U.S. 218, 235, 94 S.Ct. 467, 476, 3 L.Ed.2d 427 (1973), the Court held that the scope of a search incident to arrest includes a "full search of the person," and that such a search is reasonable under the Fourth Amendment even without a warrant. Appellees argue that under Chimel and Robinson, the body cavity search of the Fullers, conducted pursuant to lawful arrest to discover a missing ring, amounted to a "full search" that was both reasonable and lawful.
 
 
 52
 We rejected this very argument in Giles v. Ackerman, 746 F.2d 614, 616 (9th Cir.1984), cert. denied, 471 U.S. 1053, 105 S.Ct. 2114, 85 L.Ed.2d 479 (1985). In Giles we held that the "full search" authorized by Robinson was limited to a pat-down and an examination of the arrestee's pockets, and did not extend to "a strip search or bodily intrusion." 746 F.2d at 616. While Giles involved a misdemeanor and the present case concerns a felony, this distinction is of no consequence. The holding of Giles was that Robinson simply did not authorize the kind of search at issue in this case. See also Mary Beth G. v. City of Chicago, 723 F.2d 1263 (7th Cir.1983) (noting that Robinson "simply did not contemplate the significantly greater intrusions" involved in strip and visual body cavity searches). Therefore, the visual body cavity inspection was not justified as a search incident to arrest.
 
 
 53
 C. Search Conducted With Reasonable Suspicion
 
 
 54
 We explained in Kennedy v. Los Angeles Police Dept., 901 F.2d 702, that while the LAPD's general practice of performing strip and visual body cavity searches on all felony arrestees without considering the crime charged and the circumstances surrounding the arrest was unconstitutional under Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, a visual body cavity search of a particular detainee for contraband or weapons may still be justified where a police officer has reasonable suspicion to conduct such a search. Id. at 714-15.
 
 
 55
 We first adopted the reasonable suspicion standard for such searches in Giles v. Ackerman, 746 F.2d 614, where we held that arrestees charged with minor offenses may be subjected to a strip search only if jail officials possess a reasonable suspicion that the individual arrestee is carrying or concealing contraband. Id. at 617. Reasonable suspicion may be based on factors such as the nature of the offense, the arrestee's appearance and conduct, and any prior arrest record. Id.
 
 
 56
 In Kennedy, we applied the Giles standard and concluded that the police officer had no reasonable suspicion to believe that Karen Kennedy was concealing dangerous contraband, and that the body cavity search was therefore unjustified. As Judge Hall explained:
 
 
 57
 The grand theft charge here centered around an ordinary disagreement between two roommates. No weapons, no drugs, no contraband, no violent acts of any kind were involved. Nor were there any other circumstances that provided reasonable suspicion to believe that Kennedy concealed contraband.
 
 
 58
 Kennedy at 716.
 
 
 59
 Appellees argue that in this case, the body cavity searches of the Fullers were justified because the circumstances surrounding their arrest provided grounds for reasonable suspicion that one of the suspects concealed "contraband"--namely, the ring which they were accused of stealing.
 
 
 60
 Appellees' argument, however, ignores the fundamental principle embodied in the Supreme Court's holding in Wolfish and reiterated in our holdings in Kennedy and Giles. The clearly-stated rationale underlying those decisions, which allow body cavity searches of prisoners and detainees on less than probable cause, is to protect prisons and jails from smuggled weapons, drugs or other contraband which pose a threat to the safety and security of penal institutions. See, e.g., Wolfish, 441 U.S. at 559, 99 S.Ct. at 1884 (noting that a detention facility "is a unique place fraught with serious security dangers" and that prisoner strip searches were justified by "balancing the significant security interests of the institution against the privacy interests of the inmates"); Kennedy, 901 F.2d at 712-14 (citing the problems inherent in maintaining prison security and noting that the exigencies of a prison setting demanded a departure from the traditional probable cause analysis); Giles, 746 F.2d at 617 (holding that the county jail's blanket policy of strip searching all arrestees was not necessary to protect institutional security); Tribble v. Gardner, 860 F.2d 321, 325-326 (9th Cir.1988) (holding that digital rectal searches of prison inmates which were unrelated to security considerations would violate the Fourth Amendment).
 
 
 61
 Other courts reviewing the legality of institutional strip searches have also concluded that intrusive detainee searches are valid only when justified by institutional security concerns. See, e.g., Watt v. City of Richardson Police Dept., 849 F.2d 195, 198 (5th Cir.1988) (concluding it was reasonable for police to strip search arrestees where their offenses "posed the very threat of violence by weapons or contraband drugs that they must curtail in prisons"); Weber v. Dell, 804 F.2d 796, 800 (2d Cir.1986), cert. denied, 483 U.S. 1020, 107 S.Ct. 3263, 97 L.Ed.2d 762 (1987); Mary Beth G. v. City of Chicago, 723 F.2d 1263, 1271 (7th Cir.1983); Holton v. Mohon, 684 F.Supp. 1407, 1415 (N.D.Tex.1987) (purpose of strip and body cavity search is to look for weapons or contraband to protect inmates as well as jail personnel).
 
 
 62
 These decisions suggest that strip and body cavity searches of detainees may be conducted based on reasonable suspicion only where such searches are necessary to protect the overriding security needs of the institution--that is, where officials have a reasonable suspicion that a particular detainee harbors weapons or dangerous contraband.
 
 
 63
 In this case, however, Appellees never contended that the search of the Fullers was necessary to maintain jail security. In fact, Appellees emphatically denied that the search was conducted pursuant to the LAPD policy of strip searching felony arrestees to discover hidden weapons or contraband which posed a threat to the security of the jail. Instead, Appellees maintain that Officer Barham conducted the body cavity searches "in order to discover and seize the fruits or evidence of crime"--that is, the missing ring. Appellees have offered no evidence that the ring itself posed any threat to the safety of other detainees, or to the security of the jail.[9]
 
 
 64
 Moreover, there is no evidence that the Fullers were ever even incarcerated with the general jail population while being detained at the LAPD central station. In determining the constitutionality of strip searches of arrestees, courts have distinguished between searches of detainees who were simply awaiting bail, and searches conducted on inmates admitted or about to be admitted to the general jail population. In Dobrowolskyj v. Jefferson County, 823 F.2d 955 (6th Cir.1987), for instance, the Sixth Circuit upheld the strip search of a detainee in a county jail after finding that he "was not searched until he was about to be moved into contact with the general jail population." Id. at 958. The detainee was initially placed in a holding cell and subjected only to a "pat down" search, but was later moved to the general jail area and strip searched. The court ruled that the county's "more narrowly drawn policy" of strip searching only those detainees intermingled with the inmate population had "a less intrusive impact on the privacy interests of all detainees than a broader blanket search policy." Id. at 959. The court noted that:
 
 
 65
 The security interests of the jail in conducting a search at this point were strong. Dobrowolskyj was about to come into direct contact with the general jail population, including prisoners who would then be moved into all sections of the jail. The jail had legitimate interests in preventing the flow of contraband into the other sections of the jail.
 
 
 66
 Id.
 
 
 67
 The court contrasted Dobrowolskyj's situation from the one presented in Dufrin v. Spreen, 712 F.2d 1084 (6th Cir.1983), where the detainee remained alone in an individual cell overnight and did not come into contact with the general jail population. Dobrowolskyj at 958. See also Masters v. Crouch, 872 F.2d 1248, 1254 (6th Cir.1989) (fact that detainee was intermingled with other inmates has never alone been found to justify a strip search without considering the nature of the offense and whether the detainee might attempt to introduce weapons or contraband into the institution); Logan v. Shealy, 660 F.2d 1007, 1013 (4th Cir.1981) (finding strip search of detainee unconstitutional where, among other things, detainee was never intermingled with the general jail population).
 
 
 68
 Here, it is unclear whether the Fullers were ever intermingled with the general jail population while they were at the central station.[10] Indeed, the record is silent as to where the Fullers were held, how long they were held, or whether they ever came into contact with other inmates. What is clear is that Appellees have offered no evidence which suggests that the body cavity searches of the Fullers were conducted to further jail security.
 
 
 69
 Therefore, the rationale underlying Wolfish and Kennedy--which only allows strip searches of detainees with less than probable cause where the objective is to discover weapons or contraband--does not apply to the instant case. We see no reason to extend the reasonable suspicion standard to body cavity searches for ordinary stolen property. Such an extension would be inconsistent with basic fourth amendment principles. In Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), the Supreme Court held that in order for the police to draw blood from a defendant arrested for drunk driving, there must be, at the least, probable cause to believe that the blood test will reveal the presence of alcohol. The defendant in Schmerber, like the Fullers, was already lawfully in custody when the police decided to conduct the "search." The Court explained the relevant principle as follows:
 
 
 70
 The interests in human dignity and privacy which the Fourth Amendment protects forbid any such intrusions on the mere chance that desired evidence might be obtained. In the absence of a clear indication that in fact such evidence will be found, these fundamental human interests require law officers to suffer the risk that such evidence may disappear unless there is an immediate search.
 
 
 71
 Id. at 769-70, 86 S.Ct. at 1835.
 
 
 72
 In our view, Schmerber governs all searches that invade the interior of the body--whether by a needle that punctures the skin or a visual intrusion into a body cavity.[11] "The interests in human dignity and privacy" invaded when a public official peers inside a person's body cavity are at least as great as those invaded by a needle piercing the skin. Therefore, a body cavity inspection cannot be justified by a lesser standard than that applied in Schmerber for a blood test.
 
 
 73
 The defendants would have us rule that the "clear indication" described in Schmerber refers to a standard less than probable cause. This view has been expressly rejected by the Supreme Court. In a border detention case, the Court stated that the "clear indication" language in Schmerber was "used to indicate the necessity for particularized suspicion that the evidence sought might be found within the body of the individual, rather than as enunciating still a third Fourth Amendment threshold between 'reasonable suspicion' and 'probable cause'." United States v. Montoya de Hernandez, 473 U.S. 531, 540, 105 S.Ct. 3304, 3310, 87 L.Ed.2d 381 (1985). In short, the "clear indication" language does not refer to a level of suspicion. Indeed, Schmerber itself makes clear that the level of suspicion required for a search into the interior of a person's body is (at least outside the prison security and border entry contexts), probable cause.
 
 
 74
 Although the Court did not expressly state in Schmerber that probable cause is required for a search into the interior of a person's body, this principle is implicit in the holding. After finding that there was probable cause to administer the blood test, the Court went on to discuss the warrant requirement, stating:
 
 
 75
 Although the facts which established probable cause to arrest in this case also suggested the required relevance and likely success of a test of petitioner's blood for alcohol, the question remains whether the arresting officer was permitted to draw these inferences himself, or was required instead to procure a warrant before proceeding with the test. Search warrants are ordinarily required for searches of dwellings, and absent an emergency, no less could be required where intrusions into the human body are concerned.
 
 
 76
 384 U.S. at 770, 86 S.Ct. at 1835. By the terms of the fourth amendment, a warrant may only issue "upon probable cause." In asking whether a warrant was required to search the interior of a person's body the Court took for granted that probable cause was required. The probable cause requirement was a necessary component of the warrant inquiry. We therefore hold that--absent the circumstances justifying body cavity searches for weapons or dangerous contraband on reasonable suspicion in the jail context--an arrestee may only be subjected to such a search if there is probable cause to believe that he has secreted the item sought in a body cavity.
 
 
 77
 Moreover, the police were also required to obtain a warrant before conducting the body cavity searches. In Schmerber, the Court noted that the exigent circumstances exception to the warrant requirement applied because during the time it would take to procure a warrant, the evidence of the defendant's intoxication would be eliminated from his bloodstream. 384 U.S. at 770, 86 S.Ct. at 1835. But the Court made clear that absent such an "emergency" a warrant would have been required. Id.[12]
 
 
 78
 In the present case, we need not decide whether Officer Barham had probable cause to believe that Annise or Roshaun was hiding a stolen ring in her body, because the body cavity searches were not administered pursuant to a warrant issued by a neutral magistrate, and because no exigent circumstances existed. There was no risk that the ring, if hidden in a body cavity, would have been discarded or destroyed. See, e.g., Bouse v. Bussey, 573 F.2d 548 (9th Cir.1977) (invalidating the forced taking of a sample of inmate's pubic hair without a warrant where there was no danger that the evidence might be destroyed before a warrant could be obtained). In a custodial setting, the police could have easily guarded against the possibility that one of the Fullers would remove the ring from a body cavity by observing them while a warrant was obtained. Nor was the ring likely to pose any health risk to an individual secreting it within her body. In sum, there were no exigent circumstances to excuse the failure to obtain a warrant.
 
 
 79
 We conclude that the warrantless visual body cavity inspections were unconstitutional. We now must consider whether the district court erred in finding Officer Barham was entitled to qualified immunity.
 
 D. Qualified Immunity
 
 80
 Officer Barham would enjoy qualified immunity from liability in connection with the body cavity searches of the Fullers if a reasonable police officer could have believed the searches were lawful, in light of clearly established law and the information the officer possessed at the time. Anderson v. Creighton, 483 U.S. at 641, 107 S.Ct. at 3039.
 
 
 81
 Appellees point out that the Fullers were arrested and searched on February 21, 1987, six months before the district court declared the LAPD blanket strip search policy unconstitutional in Kennedy v. Los Angeles Police Dept., 667 F.Supp. 697 (C.D.Cal.1987). Appellees maintain that based on the law as it existed at the time of the search, Officer Barham reasonably could have believed that any strip search of a felony arrestee was lawful, and that officers had no reason to anticipate the court's ruling to the contrary in Kennedy. In the alternative, Appellees argue that if any showing was necessary to justify the search, all that was required was an individualized suspicion that the arrestees were carrying or concealing contraband.
 
 
 82
 Given the state of the law regarding institutional strip search policies in 1987, it can hardly be said that a reasonable police officer could have believed that any strip search conducted pursuant to felony arrest was lawful. In 1984, in Giles, for instance, we clearly stated that body cavity searches of minor offense arrestees were not justified by arrest alone, and that such searches could only be conducted if jail officials possessed a reasonable suspicion that an arrestee was concealing contraband. See Giles, 746 F.2d at 614.
 
 
 83
 In 1986, in Ward v. County of San Diego, 791 F.2d 1329 (9th Cir.1986), cert. denied, 483 U.S. 1020, 107 S.Ct. 3263, 97 L.Ed.2d 762 (1987), we reiterated that a blanket policy subjecting all minor offense arrestees to body cavity searches was unconstitutional, and held that the sheriff under whom such searches were performed was not entitled to qualified immunity. We determined that even prior to Giles, the law was sufficiently clear at the time of the search to subject the sheriff to liability under 42 U.S.C. § 1983, if the policy proved unreasonable upon remand. Ward at 1333.
 
 
 84
 Both Giles and Ward held before the searches in this case were conducted that arrest alone was insufficient to justify a body cavity search, and that such searches were lawful only if an officer had an individualized suspicion that a person was carrying or concealing contraband. Although Giles and Ward dealt with arrestees charged with minor offenses, the reasoning in those cases applies equally to the present situation. The Fullers were arrested for shoplifting a ring; they did not use coercion, violence, or weapons of any kind. See Kennedy at 716. At the time of the body cavity searches, their mere status as arrestees was, as stated in Giles and Ward, insufficient to justify a body cavity search without some reason to suspect they were actually harboring contraband.
 
 
 85
 Alternatively, Appellees maintain that given the circumstances surrounding the Fullers' arrest, a reasonable police officer could have believed that either Annise or Roshaun was concealing the missing ring within her body, and that a body cavity search was lawful.
 
 
 86
 We question whether in this situation, a reasonable police officer could have formed a reasonable suspicion that one of the Fullers had secreted contraband in a body cavity. After leaving the jewelry store, the Fullers did not attempt to flee the scene. Rather, they continued shopping, and later returned to the area to eat. The Fullers' behavior suggests that they did not anticipate their arrest. Unlike drug smugglers crossing the border, who know they may be subject to a thorough search, see, e.g., United States v. Aman, 624 F.2d 911 (9th Cir.1980), the Fullers would have had no motive to conceal the ring within their bodies after leaving the store. See also Giles at 617 (an arrestee's confinement in county jail is an unplanned event, such that strip search policy "could not possibly deter arrestees from carrying contraband"). In addition, it appears that the Fullers were not out of the sight of other witnesses at any time after Kashanian confronted them, leaving them little opportunity to secrete the ring in a body cavity.
 
 
 87
 Moreover, as explained above, the case law at the time the searches took place suggested that a reasonable suspicion by the officer that the Fullers were harboring a stolen ring was not enough to justify visual body cavity searches where there was no evidence that the object sought posed any threat to jail security.
 
 
 88
 Nevertheless, we are not prepared to say that the rule we make explicit today--in particular, the warrant requirement--was clearly established at the time of the searches in question. The rationale underlying the decisions in Wolfish, Giles and Ward plainly evinced an overriding concern for maintaining the safety and security of penal institutions. The language appearing in those opinions, however, suggested that a body cavity search could be justified if the official had reasonable suspicion that an arrestee was hiding "contraband" of any sort. See, e.g., Wolfish, 441 U.S. at 559, 99 S.Ct. at 1884 (concluding that body cavity searches of prisoners were justified to guard against "smuggling of money drugs, weapons, and other contraband"); Giles, 746 F.2d at 617 (limiting body cavity searches to situations where jail officials have a reasonable suspicion that an arrestee is "carrying or concealing contraband").
 
 
 89
 Before a right may be found to be clearly established, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson, 483 U.S. at 640, 107 S.Ct. at 3039. We do not believe that a reasonable police officer would have necessarily understood at the time she conducted the body cavity searches of the Fullers that the searches violated the Fullers' Fourth Amendment rights. Accordingly, we hold that the district court did not err in concluding that Officer Barham was entitled to qualified immunity in connection with the body cavity searches.
 
 V. The City's Liability
 
 90
 According to Monell v. Department of Social Services, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978), a municipality is liable for damages under 42 U.S.C. § 1983 when "action pursuant to official municipal policy of some nature caused a constitutional tort." The Fullers maintain that the City is liable for damages under Monell because the searches at issue here were conducted pursuant to the City's policy of strip searching all felony arrestees.
 
 
 91
 The LAPD strip search policy is unconstitutional on its face. Kennedy, 901 F.2d at 713-14. Moreover, as we noted above, the body cavity search of the Fullers was unconstitutional because the warrant requirement was neither satisfied nor excused by exigent circumstances. However, we cannot decide at this stage in the proceedings (as explained in Section IV, supra ) whether the search was conducted pursuant to the blanket policy, or whether it was performed because of the officer's individualized belief that the Fullers were harboring contraband. Nor can we decide whether, if the latter is the case, Officer Barham was acting pursuant to an LAPD policy or custom of conducting visual body cavity inspections in order to detect stolen property without probable cause and/or without a warrant. The district court thus erred in granting summary judgment on this issue.
 
 
 92
 We therefore remand this matter to the district court to allow the trier of fact to determine whether the police officer conducting the searches was in fact following an LAPD policy. If so, the City is liable for any damages the Fullers may have sustained as a result.
 
 VI. Conclusion
 
 93
 We affirm the district court's ruling that the police officers who arrested the Fullers are entitled to qualified immunity in connection with the arrest.
 
 
 94
 On the issue of the strip and visual body cavity searches, however, we reverse the grant of summary judgment in favor of Appellees. We conclude that genuine issues of material fact remain in dispute regarding the police officer's purpose in conducting the searches, which bear directly on the City's liability.
 
 
 95
 If the searches were conducted pursuant to the LAPD blanket strip search policy, the searches constituted a violation of the Fullers' Fourth Amendment rights, and the City is liable to the Fullers for any resulting damages. We therefore remand to the trier of fact for a determination of the police officer's motivation in conducting the searches.
 
 
 96
 In regard to the police officer's liability in conducting the searches, we conclude that the visual body cavity searches, if conducted to detect evidence of alleged shoplifting, were not justified by felony arrest alone. We hold that searches conducted in such circumstances must be supported by probable cause to believe that the arrestee is harboring evidence of a crime within his or her body, and require a warrant unless exigent circumstances are present.
 
 
 97
 Nonetheless, we conclude that a reasonable police officer could have believed at the time the Fullers were searched that the searches were lawful. We therefore hold that the officer conducting the searches in this case is entitled to qualified immunity.
 
 
 98
 Affirmed in part, reversed in part, and remanded. Each party to bear its own costs.
 
 
 99
 CYNTHIA HOLCOMB HALL, Circuit Judge, concurring:
 
 
 100
 This case presents us with three substantive issues: First, whether summary judgment was properly granted in favor of Officers Liggett, Parga, and Barham on the Fullers' claim that these officers unlawfully arrested them; second, whether summary judgment was properly granted in favor of Officer Barham on the Fullers' claims that Officer Barham unlawfully subjected them to a visual body cavity search ("strip search"); third, whether summary judgment was properly granted in favor of the City of Los Angeles on the Fullers' claims that they were unlawfully strip searched pursuant to city policy. Although I agree with the majority's ultimate resolution of each of these issues, I disagree with portions of its analysis. Accordingly, I write separately.
 
 
 101
 * The majority correctly concludes that qualified immunity shields officers Liggett, Parga, and Barham from liability for the arrest of the Fullers. However, the majority's analysis is seriously flawed. In determining whether reasonable officers in the arresting officers' positions could have believed that they had probable cause to execute a warrantless arrest, the majority asks whether the arresting officers fulfilled their "duty to investigate" before arresting the Fullers. In its analysis, the majority subtly promulgates the rigid rule that arresting officers have a "duty to conduct an investigation into the basis of" an eyewitness report before making an arrest that is founded on the report. Ante at 1444. The majority erroneously recognized an independent "duty to investigate" as a vehicle for promulgating police procedures.
 
 
 102
 It is clearly established that the presence or absence of probable cause is a fact-specific, practical inquiry that turns on the "totality of the circumstances." Illinois v. Gates, 462 U.S. 213, 238-39, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983); United States v. Lindsey, 877 F.2d 777, 781 (9th Cir.1989). "Rigid legal rules are ill-suited to an area of such diversity." Gates, 462 U.S. at 232, 103 S.Ct. at 2329. It is equally well established that qualified immunity applies if a reasonable police officer could have believed that his or her conduct was lawful, in light of clearly established law and the information the officers possessed. Anderson v. Creighton, 483 U.S. 635, 641, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987); Thorsted v. Kelly, 858 F.2d 571, 573 (9th Cir.1988); Merriman v. Walton, 856 F.2d 1333, 1335 (9th Cir.1988), cert. denied, 491 U.S. 905, 109 S.Ct. 3188, 105 L.Ed.2d 696 (1989). Thus, to decide whether the arresting officers have qualified immunity we should consider only whether in the "totality of the circumstances" known to the arresting officers, these officers reasonably could have thought that they possessed probable cause to arrest the Fullers. See Creighton, 483 U.S. at 641, 107 S.Ct. at 3039; Thorsted, 858 F.2d at 573; Merriman, 856 F.2d at 1335.
 
 
 103
 We have never recognized, as the majority purports to recognize, a "duty to investigate" component of this probable cause inquiry. The majority's sole support for its "duty to investigate" is Merriman v. Walton, 856 F.2d 1333 (9th Cir.1988), cert. denied, 491 U.S. 905, 109 S.Ct. 3188, 105 L.Ed.2d 696 (1989). However, the majority's reliance on Merriman is completely misplaced. Indeed, in Merriman we closely analyzed the information known to the arresting officer in order to decide what we considered to be the key question: "Whether a reasonable police officer, knowing what [the arresting officer] knew, could have believed there was probable cause for Merriman's warrantless arrest.... Probable cause is determined by applying a 'totality-of-the-circumstances' analysis" Id. at 1335.[1] Given what the officer knew, we held that there was not enough information to support probable cause, and stated that "[a] reasonable police officer would have made further inquiry before effecting a warrantless arrest." The majority mistakenly relies on this statement because it was nothing more than an offhanded admonishment. Id. Obviously, when the evidence does not support a finding of probable cause, the logical response is to say that the officers should have inquired further. In short, the majority's view that Merriman creates an independent "duty to investigate" is baseless, and is inconsistent with both Ninth Circuit and Supreme Court precedent.
 
 
 104
 Even though the majority erroneously dwells on its "duty to investigate," the majority correctly concludes that in the instant case the arresting officers are entitled to qualified immunity. In light of the "totality of the circumstances," which are adequately described in the majority opinion, "a reasonable police officer, knowing what [the arresting officers] knew, could have believed there was probable cause for [the Fullers'] warrantless arrest." Merriman, 856 F.2d at 1335; see also Creighton, 483 U.S. at 641, 107 S.Ct. at 3039.
 
 II
 
 105
 The second major question before us is whether Officer Barham is entitled to qualified immunity from the Fullers' claim that she unlawfully subjected them to a strip search. The majority has correctly described the standards against which evidentiary strip searches are measured: such searches must be justified by probable cause, and a warrant must be obtained prior to the search in the absence of exigent circumstances. The majority also correctly concludes that this standard was not clearly established at the time that the instant strip searches took place. Thus, I agree with the majority's conclusion that Officer Barham is entitled to qualified immunity for the strip searches. See Creighton, 483 U.S. at 641, 107 S.Ct. at 3039; The Presbyterian Church (U.S.A.) v. United States, 870 F.2d 518, 526 (9th Cir.1989); Conner v. City of Santa Ana, 897 F.2d 1487, 1492 (9th Cir.) (holding that the law was clearly established), cert. denied, --- U.S. ----, 111 S.Ct. 59, 112 L.Ed.2d 34 (1990).
 
 
 106
 Unfortunately, the majority goes considerably further than is necessary. The majority not only discerns the relevant standard, but the majority goes on to apply this standard to the facts of the instant case. This latter step is simply unnecessary. As the majority itself concludes, the probable cause/warrant standard was not "clearly established" at the time of the searches in issue, and as a result Officer Barham is entitled to immunity. See Creighton, 483 U.S. at 641, 107 S.Ct. at 3039.
 
 
 107
 Moreover, it is worth stressing that the probable cause/warrant standard that we recognize today operates in a very limited sphere. Officer Barham's search for the ring is evaluated under the probable cause/warrant standard only because the search cannot be justified by reference to the security needs of a detention facility; the defendants have admitted that there was no reason to suspect that the Fullers were harboring drugs, weapons, or other contraband that would have posed a security threat to the facilities at which the Fullers were detained. If the circumstances surrounding a strip search do justify a reasonable suspicion that a suspect is harboring contraband that will pose a security threat to a detention facility, then the search is constitutionally valid. See Kennedy v. Los Angeles Police Dept., 901 F.2d 702, 712, 715-16 (9th Cir.1990) (holding that strip searches of felony suspects are permissible if justified by a reasonable suspicion that drugs or weapons are being smuggled into a detention facility; no warrant is required); Ward v. County of San Diego, 791 F.2d 1329, 1332-1333 (9th Cir.1986) (holding that prison security related searches of misdemeanor arrestees are justified by reasonable suspicion that the arrestees have weapons or contraband on their persons), cert. denied sub nom, Duffy v. Ward, 483 U.S. 1020, 107 S.Ct. 3263, 97 L.Ed.2d 762 (1987); Giles v. Ackerman, 746 F.2d 614, 617 (9th Cir.1984) (holding that, in light of the jail's need for security, strip searches of person arrested for a minor traffic offenses are valid if undertaken on the basis of "reasonable suspicion that the individual arrestee is carrying or concealing contraband"), cert. denied, 471 U.S. 1053, 105 S.Ct. 2114, 85 L.Ed.2d 479 (1985).
 
 III
 
 108
 The final issue in this case is whether summary judgment was properly granted in favor of the City of Los Angeles. While I agree with the majority that this case should be remanded in order for Los Angeles' liability to be determined at trial, the majority's analysis is incomplete in one respect and overbroad in another.
 
 
 109
 A municipality is liable under Section 1983 only if "action pursuant to official municipal policy of some nature caused a constitutional tort." Monell v. Department of Social Services, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978); see also City of Canton, Ohio v. Harris, 489 U.S. 378, 389, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412 (1989). Thus, in order for Los Angeles to be liable for the actions of its officers three conditions must be established: First, there must be a constitutionally infirm municipal policy in issue; second, this municipal policy must have been applied to plaintiff; third, application of this policy must have resulted in the deprivation of a constitutional right. See id. Although the majority's treatment of the first and second Monell conditions is generally adequate, the majority's casual one-sentence discussion of the third Monell condition is inadequate. We must determine whether the Fullers' Fourth Amendment interest in freedom from unreasonable searches was violated in this case by the application of the City's facially invalid strip search policy.
 
 
 110
 The application of a facially unconstitutional search policy to an individual does not establish a "per se" constitutional violation. See Kennedy, 901 F.2d at 715. For the Constitution forbids only objectively "unreasonable" searches. See U.S. Const. amend. IV; Torres v. Commonwealth of Puerto Rico, 442 U.S. 465, 471, 99 S.Ct. 2425, 2429, 61 L.Ed.2d 1 (1979) ("the grounds for a search must satisfy objective standards"). If in the circumstances of a particular case a search is objectively reasonable, there is no constitutional violation. Thus, in order to decide whether the Fullers were deprived of their right to be free of unreasonable searches, we must determine whether the searches in issue were justified by probable cause, and whether exigent circumstances rendered a warrant unnecessary.[2] See Part II, supra.
 
 
 111
 Probable cause does not require certainty. Rather, "[t]his court must make a 'practical, common-sense decision' whether under the 'totality of the circumstances' known to [Officer Barham] at the time ... there was a 'fair probability' that contraband or evidence of a crime would be found...." Lindsey, 877 F.2d at 780 (quoting Gates, 462 U.S. at 238-39, 103 S.Ct. at 2332 (1983)).
 
 
 112
 Contrary to the majority's intimations, there was probable cause to strip search the Fullers. The offense for which the Fullers were arrested was theft of a small but valuable object, a ring. Obviously, a ring may easily be concealed in a body cavity. Officer Barham had received an eyewitness report that the Fullers had taken the ring, and interviews with other witnesses at the scene confirmed this eyewitness report. One of the Fullers could have secreted the ring in a body cavity during the interval between the time they left the jewelry store and the time that they were fingered by the store keeper. During this period the Fullers were unobserved. Or the Fullers might have secreted the ring in a body cavity during the substantial confusion that ensued after the store keeper accused them of stealing it.[3] Further, searches in the areas which the Fullers were known to have lingered did not turn up the ring, and these areas were searched before the Fullers were subjected to the strip searches. In these circumstances, there was a "fair probability" that the ring would be found if the Fullers were strip searched.
 
 
 113
 Still, in order for a warrantless strip search to be valid, the circumstances must establish exigency as well as probable cause. "Exigent circumstances are defined as 'those circumstances that would cause a reasonable person to believe that entry ... [or other relevant prompt action] was necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts.' " Lindsey, 877 F.2d at 780-81 (quoting United States v. McConney, 728 F.2d 1195, 1199 (9th Cir.) (en banc), cert. denied, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984)). We have recognized that exigent circumstances may be presented based solely on the need to preserve evidence. See United States v. Wulferdinger, 782 F.2d 1473, 1475 (9th Cir.1986); United States v. Hicks, 752 F.2d 379, 384 (9th Cir.1985); United States v. Kunkler, 679 F.2d 187, 190 (9th Cir.1982). However, the government has the burden of establishing that the searching officers were confronted with exigent circumstances. Lindsey, 877 F.2d at 781.
 
 
 114
 In the instant case, the City of Los Angeles has presented no evidence that it could not monitor the Fullers, who were in custody, or otherwise prevent the Fullers from disposing of the ring. Absent some such presentation, we cannot say that exigent circumstances rendered a warrant unnecessary. See Bouse v. Bussey, 573 F.2d 548, 550 (9th Cir.1977) (holding that exigent circumstances were not presented because there was no danger that the evidence would be destroyed). Cf. United States v. Suarez, 902 F.2d 1466, 1468 (9th Cir.1990) (holding that exigent circumstances were not presented because the government could have monitored the apartment house which contained evidence to prevent the evidence's destruction). Thus, Officer Barham's failure to obtain a warrant rendered the strip searches that she conducted on the Fullers constitutionally "unreasonable." As such, the third Monell condition for municipal liability is met. I therefore agree that we must remand this case to the district court so that a jury may determine whether the unconstitutional strip searches were conducted pursuant to the City's automatic strip search policy.
 
 
 115
 Unfortunately, the majority is not content to have the Fullers win on the basis on which they argued their case. The majority states that there is a material issue of fact as to whether: "Officer Barham was acting pursuant to an LAPD policy or custom of conducting visual body cavity inspections in order to detect stolen property without probable cause and/or without a warrant." The Fullers have never argued that they were searched pursuant to any such municipal policy. And it is well established that a district court will not be reversed on a ground not raised before it. See Image Technical Service, Inc. v. Eastman Kodak, 903 F.2d 612, 615 n. 1 (9th Cir.1990) (holding that plaintiff's failure to raise an issue in opposition to a defendant's motion for summary judgment waived the issue), cert. granted, --- U.S. ----, 111 S.Ct. 2823, 115 L.Ed.2d 994 (1991); United States v. Munoz, 746 F.2d 1389, 1390 (9th Cir.1984) (refusing to consider a tort theory not raised below in a contract action). Thus, on remand the Fullers should be limited to arguing, as they have throughout this litigation, that they were strip searched pursuant to the City's automatic strip search policy.
 
 
 116
 With these reservations, I concur.
 
 
 
 [1]
 Roshaun claims that she was menstruating at the time, and that Barham required her to remove her sanitary napkin for inspection. The City and officers dispute this
 
 
 [2]
 Although the LAPD's strip search policy on its face appears to distinguish between a skin search and a visual body cavity search, we previously determined in Kennedy v. Los Angeles Police Dept., 901 F.2d 702, 710-711 (9th Cir.1989) (as amended), that in practice, the searches are routinely conducted together and are considered " 'one and the same.' "
 
 
 [3]
 On May 26, 1989, the district court granted the Fullers' motion for summary judgment against the County in connection with the strip searches conducted by Los Angeles County Sheriff's Department personnel. The court concluded that the searches could not be justified by the County's strip search policy, were not supported by reasonable suspicion, and, therefore, violated the Fullers' Fourth Amendment rights. That part of the action has been settled, and the legality of those searches is not before us
 
 
 [4]
 We also reject Defendants' argument that the Fullers' appeal of the summary judgment order is untimely under Fed.R.App.P. 4(a). Although the Fullers did not file their appeal until June 15, 1989 (more than 30 days after the district court issued its summary judgment order on March 8, 1989), the district court did not order judgment to be entered on the summary judgment order until June 8, 1989, the same day the court denied the Fullers' motion for reconsideration. The Fullers notice of appeal was thus timely as to both the granting of summary judgment in favor of Defendants and the denial of the motion for reconsideration
 
 
 [5]
 Rule 7.16 of the Local Rules of the United States District Court, Central District, upon which the Fullers apparently based their motion, provides in part:
 A motion for reconsideration of the decision on any motion may be made only on the grounds of ...
 (c) a manifest showing of a failure to consider material facts presented to the Court before such decision. No motion for reconsideration shall in any manner repeat any oral or written argument made in support of or in opposition to the original motion.
 
 
 [6]
 It is unclear the extent to which the district court considered the issue of probable cause in granting summary judgment for Appellees. In their cross-motions for summary judgment, the parties focused on the issue of qualified immunity, and did not discuss probable cause. Nonetheless, the district court concluded that the officers had "reasonable cause" to arrest the Fullers for grand theft, and that, in any event, the officers were entitled to qualified immunity in connection with both the arrest and strip search
 
 
 [7]
 The Fullers maintain that other factual discrepancies surrounding their arrest precluded summary judgment, including:
 1) the differences between their version of the incident and the other witnesses' reports, and
 2) the differences between Kashanian's testimony in his deposition and in the police report.
 We conclude that these minor discrepancies are immaterial and do not negate the officers' reasonable belief that probable cause existed to arrest the Fullers for theft. The fact that Kashanian stated in his deposition that he "had a feeling" the Fullers took the ring is immaterial because he firmly conveyed to the officers his sincere belief that the Fullers took the ring, and described the underlying facts which formed the basis of his belief. He also stated in his deposition that he had no doubt that Annise stole the ring. The minor discrepancy regarding the number of rings the Fullers examined was attributable to Kashanian's excitement and language difficulties, and in any case is immaterial.
 
 
 [8]
 Defendants maintain that although "M.G." did talk to the Fullers, Kashanian, not "M.G.," was the last person to see the stolen ring
 
 
 [9]
 Not only is it apparent that a ring is not dangerous contraband; it would appear that it is not contraband at all. There is no reason to believe that a ring is the type of property that it is illegal to bring into a prison
 
 
 [10]
 Although the record establishes that the Fullers were later transported to the Los Angeles County Sybil Brand Institute, where they were again subjected to strip and body cavity searches and incarcerated for twelve hours pending arraignment, that aspect of the Fullers' action, as we noted previously, has been settled and is not before us
 
 
 [11]
 We are aware of the First Circuit's opinion to the contrary, see United States v. Klein, 522 F.2d 296 (1st Cir.1975). In Klein, the court ruled that a strip and visual body cavity search of the defendant, who was arrested for distribution of cocaine, was not governed by Schmerber because there was "no piercing or probing of Klein's skin, nor forced entry beyond the surface of his body." Id. at 300. Our court has not followed Klein in limiting Schmerber's restrictions on "intrusions into the body" to cases in which skin is pierced or entry is forced. See Giles, 746 F.2d at 616
 
 
 [12]
 At least two state courts to have considered the question have held that a warrant is required for a body cavity search of an arrestee. See State v. Whitley, 65 Hawaii 486, 654 P.2d 354 (1982); State v. Fontenot, 383 So.2d 365 (La.1980). A leading authority on the subject discusses Whitley and Fontenot without citing any state cases that reach a contrary conclusion. See generally W. LaFave, Search and Seizure: A Treatise § 5.3(c) (1987)
 
 
 [1]
 Merriman had been arrested for kidnapping. The arresting officer knew, inter alia, "that Merriman ... was [the alleged victim's] long-time boyfriend ... [and that] the alleged victim of the kidnapping had returned." Id. We concluded that "[u]nder these circumstances, there is no probable cause." Id
 
 
 [2]
 Although the majority fails to make this inquiry, the majority's views on the matter are clearly indicated by the majority's conclusion, made in the course of its qualified immunity analysis, that Officer Barham violated the Fullers' Fourth Amendment rights when she strip searched them
 
 
 [3]
 The majority asserts that the Fullers had no opportunity to hide the ring in a body cavity after being confronted by the store keeper because "it appears that the Fullers were not out of the sight of other witnesses at any time after Kashanian confronted them...." Ante at 1451. This assertion is misleading. While the Fullers were generally in public areas during this period, they certainly were not under any surveillance