**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| C.B., a minor,<br>*Plaintiff-Appellee*,<br><br>v.<br><br>CITY OF SONORA; MACE MCINTOSH, Chief of Police; HAL PROCK, Officer,<br>*Defendants-Appellants*. | No. 11-17454<br><br>D.C. No.<br>1:09-cv-00285-AWI-SMS<br><br><br>OPINION |

Appeal from the United States District Court
for the Eastern District of California
Oliver W. Wanger, Senior District Judge, Presiding

Argued and Submitted
May 16, 2013—San Francisco, California

Filed September 12, 2013

Before: M. Margaret McKeown and Paul J. Watford,
Circuit Judges, and Thomas S. Zilly, Senior District Judge.[*]

Opinion by Judge Zilly;
Concurrence and Dissent by Judge McKeown

---

[*] The Honorable Thomas S. Zilly, Senior United States District Judge for the Western District of Washington, sitting by designation.

## SUMMARY[**]

### Civil Rights

The panel vacated a jury verdict and the district court's judgment and remanded in an action arising out of the handcuffing and removal from school of then eleven-year-old C.B. by Sonora police officers.

The jury rendered a verdict ostensibly in favor of defendants, but the district court concluded that the verdict was incomplete and inconsistent and, after extensive extemporaneous colloquies with the jurors, directed them to re-deliberate. The jury eventually returned a verdict in favor of C.B. The panel held that the verdict form and protracted unscripted discussions between the district judge and the jurors were so confusing and potentially misleading as to require a new trial. The panel further held that police officers were entitled to qualified immunity as to C.B.'s claims under 42 U.S.C. § 1983 because the law was, and still is, not clearly established that handcuffing and driving a juvenile from school to a relative's place of business implicates Fourth Amendment rights.

Concurring in part and dissenting in part, Judge McKeown stated that she concurred in the majority's decision to remand this case for a new trial. She also concurred in the remand of the state law claims. She dissented from that part of the opinion which held that police officers were entitled to qualified immunity on C.B.'s Fourth Amendment claims

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

because the facts demonstrated that C.B.'s prolonged detention was an obvious violation of the Fourth Amendment's general proscription against unreasonable seizures.

---

## COUNSEL

Cornelius J. Callahan and Stephanie Y. Wu, Borton Petrini, LLP, Modesto, California, for Defendants-Appellants.

John F. Martin and Christine Hopkins, Law Offices of John F. Martin, Walnut Creek, California, for Plaintiff-Appellee.

---

## OPINION

ZILLY, Senior District Judge:

This case involves a verdict form and protracted unscripted discussions between the district judge and the jurors that were so confusing and potentially misleading as to require a new trial. This case arises out of the handcuffing and removal from school of then eleven-year-old C.B. by Sonora Police officers. Trial proceeded against City of Sonora, Sonora Chief of Police Mace McIntosh, and Sonora Police Officer Harold (Hal) Prock on four claims: false imprisonment and intentional infliction of emotional distress ("IIED") under state law, and unlawful seizure and excessive force under 42 U.S.C. § 1983. The jury rendered a verdict ostensibly in favor of defendants, but the district court concluded that the verdict was incomplete and inconsistent and, after extensive extemporaneous colloquies with the jurors, directed them to re-deliberate. The jury eventually

returned a verdict in favor of C.B. Defendants unsuccessfully moved for judgment as a matter of law, a new trial, or remittitur, and now appeal. We hold that defendants are entitled to a new trial, and that individual defendants McIntosh and Prock are entitled to qualified immunity on the two federal claims.

## BACKGROUND

### A. C.B.'s Handcuffing and Removal from School

At the time of the events at issue in this case, C.B. was taking medication for attention-deficit and hyperactivity disorder; the medication helped C.B. focus and not get too easily distracted. On Monday, September 29, 2008, C.B. forgot to take his medication before going to school, and he proceeded to have a difficult day. Sometime during the first three periods, after one of the breaks, a broadcast on the handheld transceivers ("walkie talkies") used by school personnel indicated that C.B. had not returned to class. Karen Sinclair, a physical education ("P.E.") instructor and the disciplinarian for Sonora Elementary School, who is generally called "Coach," assisted in getting C.B. back to class before going to teach her own class. Later that morning, around 11:20 a.m., Kerri McCluskey, the school counselor, brought C.B. to Coach Sinclair's office, and indicated that C.B. needed to be there for a while. After having a brief conversation with Coach Sinclair about his "rough day," C.B. went behind a barrier in the room to have some quiet time. About twenty minutes later, C.B. told Coach Sinclair that he was ready to return to class, and she said, "okay."

Coach Sinclair's office was designated in C.B.'s plan under Section 504 of the Rehabilitation Act of 1973,

29 U.S.C. § 794, as a place where C.B. could go when he was non-responsive or needed to "cool down"; it was considered a "safe zone" for C.B. Coach Sinclair's professional relationship with C.B. dated back to when C.B. was in kindergarten, and she was familiar with C.B.'s habit of becoming unresponsive and then taking off. In fact, when C.B. was in the fourth grade, he had run away from P.E. class and ended up in the school parking lot. On that occasion, school personnel had learned that C.B. was missing, but had not yet located him when Coach Sinclair received a call indicating that C.B. was in the parking lot. C.B. had been found by John Large, who later advised Coach Sinclair that C.B. said he was "tired of feeling the way he felt and he wanted to go out into traffic and kill himself." Coach Sinclair asked C.B. about this statement, and C.B. explained "sometimes I feel like running into traffic." At trial, C.B. admitted that he had previously told Coach Sinclair he wanted to run into traffic.

Coach Sinclair had this prior incident in mind as the events of September 29, 2008, unfolded. Around noon, Coach Sinclair received word that C.B. was being unresponsive on the playground. Coach Sinclair went outside and attempted to speak with C.B. She began by commenting, "you're having a rough day today," and she indicated she was aware that he had not taken his medication. Coach Sinclair then invited C.B. to come to her office. C.B. did not respond. At trial, C.B. indicated that he had made a conscious decision not to speak.

During this interaction, Coach Sinclair was concerned about C.B. running across the playground and out an unlocked gate, which opens to Greenley Road, an arterial on which traffic often exceeds the 35 mile-per-hour limit. For

some time, Coach Sinclair attempted to persuade C.B. to return with her to her office.  She then told C.B. that she would have to call the police if he would not come inside with her.  According to Coach Sinclair, C.B. looked up for the first time during the incident and said, "Call the police." In contrast, C.B. testified he did not say anything in response to Coach Sinclair's statement that he could either "go to her office or she was going to call the cops."  C.B. indicated at trial that he thought Coach Sinclair was "just saying that to get me to go inside" and that he "didn't believe her."

Coach Sinclair used a walkie talkie to request that someone in the front office call the police to assist with an out-of-control youth.  C.B. remained seated on the bench, looking at the ground, while the police were in transit.  Chief McIntosh arrived before Officer Prock; Officer John Bowly also responded to the scene, but was not named as a defendant in this case.  Coach Sinclair advised them both orally and via hand signals that C.B. was "a runner" and had not taken his medication.

After being informed that C.B. was "a runner," Officer Prock likewise had concern about C.B.'s welfare if he were to run.  He observed that the school grounds could be easily exited.  He described nearby Greenley Road as "a busy roadway" on which "everybody usually travels on an average or close to 40, 45 miles an hour."  Moreover, Officer Prock testified that, if C.B. had attempted to run away, he and his colleagues would have needed to apprehend and restrain him, which itself might have resulted in injuries to C.B.

Officer Prock attempted to engage C.B. in conversation for approximately four to five minutes, trying even to joke with him.  C.B. remained unresponsive.  Based on his

training, Officer Prock viewed this behavior as "passively resisting" authority, perhaps while thinking about the next move. The efforts to coax C.B. into communicating having proven futile, Chief McIntosh gave a hand signal to Officer Prock indicating that handcuffs should be used. A gesture was made (touching wrists together), rather than an audible verbal cue given, so as not to trigger C.B. to run. Chief McIntosh viewed handcuffs as a means of preserving C.B.'s safety, allowing the officers to control C.B. without using physical force if he decided to run.

Officer Prock asked C.B. to stand up and put his hands behind his back, and C.B. complied. Officer Prock then applied the handcuffs. Coach Sinclair observed Officer Prock put his pinky finger between the handcuffs and C.B.'s wrists to make sure the handcuffs were not too tight. Coach Sinclair subsequently laughed with Ms. McCluskey about how loose the handcuffs were. Although C.B. testified at trial that the handcuffs hurt and caused red marks around his wrists, he acknowledged that he did not contemporaneously tell Officer Prock or his colleagues that the handcuffs were too tight or otherwise complain about them, and he indicated that the officers were "not mean" to him.

After placing C.B. in handcuffs, Officer Prock went to retrieve his vehicle, leaving C.B. with Chief McIntosh and others, who walked with C.B. to the upper parking lot. While Officer Prock was pulling his vehicle to C.B.'s location in the upper parking lot, Officer Bowly left the scene. During this time, Officer Prock received contact information for C.B.'s guardians, and he called C.B.'s uncle. Officer Prock testified that he asked the uncle to come and pick up C.B., but the uncle indicated he could not close his business to do so and requested that Officer Prock bring C.B. to the business. At

trial, Officer Prock explained that, only after he had completed the call with C.B.'s uncle, did he take steps to place C.B. in his patrol vehicle.

Chief McIntosh testified that handcuffs remained on C.B. while he was in Officer Prock's vehicle because "it is not a safe environment inside the patrol car with somebody that is not restrained." Officer Prock transported C.B. to his uncle's business and released him. By that time, C.B. had begun communicating with Officer Prock, and Officer Prock was no longer concerned about C.B. running away. The entire interaction, from police arriving at the school to C.B. being placed into his uncle's care, took roughly thirty minutes.

At trial, when asked about their decision to remove C.B. from the school and transport him to his uncle's business, both Chief McIntosh and Officer Prock described the procedure for taking temporary custody of a juvenile who is beyond the control of his or her guardian or custodian. Chief McIntosh's and Officer Prock's understanding was that school authorities did not want C.B. on the campus because he was uncontrollable. Chief McIntosh cited to Section 601 of the California Welfare and Institutions Code ("Cal. W&I") as the applicable statute. The law provides in relevant part:

> Any person under the age of 18 years . . . who is beyond the control of [his or her parents, guardian, or custodian] . . . is within the jurisdiction of the juvenile court which may adjudge the minor to be a ward of the court.

Cal. W&I § 601(a). A related provision authorizes a peace officer, without a warrant, to take into temporary custody a minor when such officer has "reasonable cause for believing that such minor is a person described in Section 601." Cal. W&I § 625(a).

## B. Resubmission to the Jury

The jury's initial answers on the verdict form were favorable to defendants, finding no liability on the excessive force and unlawful seizure claims, and finding that, although C.B. had proven the elements of his IIED claim, defendants had established the affirmative defense of privilege.[1] The jury nevertheless awarded damages for the IIED claim, recording them in response to Question 11C. The jury did not record any findings concerning the false arrest claim.

After declaring this initial verdict inconsistent and incomplete, the district judge instructed the jurors to deliberate further:

> Ladies and gentlemen, the verdicts that have been returned have what the law calls an inconsistency in them because we have a typographical error in our verdict form that, quite frankly, misled you. And so let me

---

[1] On the verdict form, Questions 1 and 3 asked whether the respective constitutional violations, excessive force and unlawful seizure, had been proven. Question 5 inquired whether City of Sonora had a longstanding practice or custom causing the use of excessive force against juveniles. Questions 6, 7, and 8 concerned the IIED claim, with the first two interrogatories aimed at liability and the last involving the affirmative defense. The jury initially answered "no" to Questions 1, 3, and 5, and "yes" to Questions 6, 7, and 8.

explain to you what happens with this verdict form.

You found no liability on either of the civil rights claims under federal law. You found that there was intentional infliction of emotional distress and that it caused harm or damage.

You then found that there was privilege, which is a defense to the claim, and it wipes out the claim. And so this should have said C, if you find that the conduct is privileged, then there is no damage because the privilege, in effect, says the conduct's okay. If you don't find the privilege, then you can award damages, but you can't award damages if you find that the conduct is privileged.

And so I have changed this instruction from 11D to 11C, because 11C are the damages for emotional distress.[2]

And then you did not make any findings on the false arrest claims. So that's one additional claim that you need to decide,

---

[2] The instruction to which the district judge referred appeared on the verdict form, directly after Question 8 regarding the affirmative defense to the IIED claim. Although the district judge announced his intention to correct the typographical error by substituting "11C" for "11D," thereby instructing the jury not to award damages on the IIED claim if it found defendants had prevailed on the affirmative defense to that claim, the final verdict form completed by the jury still contained the erroneous reference to Question 11D, which pertained to damages on the false arrest claim.

because you haven't at least recorded on your verdict form that you have decided that.[3]

In the remaining remarks on this occasion, and in the subsequent conversations with the jurors, the district court never clarified that the reason it had declared the verdict inconsistent was not because the jury's answers to Questions 1, 3, 5, 6, 7, and 8 conflicted with each other, but rather because, in light of the answers indicating no liability on the IIED claim, the jury should not have responded to Question 11C regarding damages for the IIED claim.

The jury's confusion concerning why it was being asked to deliberate again manifested itself in the following hand-written question:

Clarify question 8 [sic]
if we said yes to all on page 23 of Jury Instruction #20 doesn't that mean we answer yes to page 9 in verdicts of trial jury?

---

[3] The verdict form told the jury that, if it answered "yes" to Question 8, meaning it found defendants had proven their affirmative defense as to the IIED claim, it should not answer Question 11D (regarding damages for the false arrest claim), but that, if it answered "no" to Question 8, it should answer Question 9 (concerning liability on the false arrest claim). The verdict form failed to tell the jury to answer Question 9 if it responded "yes" to Question 8. Thus, the verdict form essentially advised the jury that, if it found in favor of defendants on the affirmative defense to the IIED claim, it did not need to answer Questions 9 and 11D or consider the merits of the false arrest claim. In rendering its initial verdict, the jury had complied with this directive, answering "yes" to Question 8 and not responding to Questions 9 or 11D.

The instruction referenced in the jury's note defined the elements of the affirmative defense to the IIED claim. Question 8, on page 9, of the verdict form, asked whether the affirmative defense had been proven. The appropriate answer to the jury's question was "yes." The district judge, however, launched into a long lecture about the elements of the affirmative defenses to the IIED and false arrest claims and the scenarios under which Question 11 concerning damages should and should not be answered. During the course of this discussion, one of the jurors asked a question that provided insight into the difficulty the jury was having:

> JUROR SEAT NUMBER EIGHT: Okay. So the fact that we answered affirmative yes to questions 6 and 7.

> THE COURT: Yes.

> JUROR SEAT NUMBER EIGHT: I guess our question is how does that affect our response to number 8? Is it conflicting?

Still failing to understand that the jurors were struggling with whether their prior answers to Questions 6, 7, and 8 were viewed by the district court as inconsistent with each other (rather than with the response to Question 11C), the district court repeated the elements of the affirmative defense to the IIED claim.

As yet unsatisfied, the same juror asked another similar question, which produced a confusing response from the district judge:

> JUROR SEAT NUMBER EIGHT:  And
> that is not a conflict?

> THE COURT:  It's not a conflict because
> it's an affirmative defense. *It's potentially a
> conflict depending on what you think of the
> conduct and the states of mind.*  But that's for
> you to determine.

[Emphasis added.]  After expressing a few more thoughts, the
district judge repeated his puzzling statement:

> *And so, there is a potential inconsistency, but
> that depends on what you find the intentions,
> the states of mind are and the conduct is in
> light of the law.*  And you're the only people
> who can make those decisions.  We cannot
> tell you how to do it.  The attorneys have told
> you how to do it in their arguments, but it's
> for you to make the ultimate decisions.

[Emphasis added.]  After substantial additional colloquy, the
jury requested permission to retire again to the jury room.
Approximately five minutes later, the jury returned to the
courtroom and was excused for the evening.

When proceedings resumed the next morning, the district
judge began another extensive colloquy with the jury.  During
this session of supplemental instruction, a juror asked for a
transcript of the explanation given the previous day.  After a
sidebar discussion with counsel, instead of providing the
requested transcript, the district judge attempted to repeat his
comments from the earlier evening.  The district judge first
summarized the claims brought by C.B., two federal and two

state law claims, and the affirmative defenses raised in connection with the state law claims, and then told the jurors:

> And *there should be consistency* -- and that was your concern -- *between those findings*. The consistency is a function of how you find the facts, which evidence you believe, how much weight you give to the evidence.

[Emphasis added.]  The district judge did not specify which "findings" needed to be consistent, and this statement could have been interpreted by the jury as indicating that its answers to Questions 1–5, concerning the federal law claims, could not conflict with its responses to Questions 6–9, regarding the state law claims.  In fact, however, the jury was not required to reach the same result on all of the claims, and it could have found Chief McIntosh and Officer Prock liable for intentional infliction of emotional distress without concluding that they had violated C.B.'s constitutional rights.

The jury deliberated for approximately four more hours, and returned a verdict opposite to the one they initially reached, finding liability against all defendants on all claims, and awarding damages.  After denying defendants' motions for judgment as a matter of law, a new trial, or remittitur, the district court entered judgment against all defendants.

## DISCUSSION

### A.  New Trial

Given the nature of the jury's superfluous and missing answers, the district court should not have required the jury

to engage in further deliberations. The decision to resubmit an inconsistent verdict for clarification when the jury is still available and the decision to give supplemental jury instructions are reviewed for an abuse of discretion. *See Duk v. MGM Grand Hotel, Inc.*, 320 F.3d 1052, 1057–58 (9th Cir. 2003); *Jazzabi v. Allstate Ins. Co.*, 278 F.3d 979, 982 (9th Cir. 2002). Whether a supplemental jury instruction misstates the law, however, is reviewed de novo. *Jazzabi*, 278 F.3d at 982. When a district court provides a jury with a general verdict form accompanied by written questions on one or more issues of fact, and the jury's answers to those questions are consistent with each other but not with the general verdict, the district court may "approve, for entry under Rule 58, an appropriate judgment according to the answers, notwithstanding the general verdict." Fed. R. Civ. P. 49(b)(3)(A); *see Nimnicht v. Dick Evans, Inc.*, 477 F.2d 133, 135 (5th Cir. 1973); *see also Wilks v. Reyes*, 5 F.3d 412, 415 (9th Cir. 1993).

On appeal, defendants have not argued that the district court erred in failing to enter judgment in accordance with the jury's initial verdict, as authorized by Rule 49(b), but they have challenged the district court's actions in connection with resubmission of the case. Our review is therefore limited to whether the verdict form and the protracted unscripted discussions the district judge had with the jurors were so confusing and potentially misleading that defendants are entitled to a new trial. "When a [deliberating] jury makes explicit its difficulties a trial judge should clear them away with concrete accuracy." *Bollenbach v. United States*, 326 U.S. 607, 612–13 (1946). "[T]he judge's last word is apt to be the decisive word," and when that last word concerns "a vital issue and [is] misleading, the error is not cured by a prior unexceptional and unilluminating abstract charge." *Id.*

at 612.  In evaluating whether a supplemental instruction was proper, the Court must look beyond whether it was "correct, so far as it went" and whether, when read in light of the original instruction, it "fairly presented the issues."  *Powell v. United States*, 347 F.2d 156, 158 (9th Cir. 1965).  Rather, the ultimate inquiry is "whether the charge taken as a whole was such as to confuse or leave an erroneous impression in the minds of the jurors."  *Id.*

We conclude that the unscripted supplemental instructions, together with the problematic verdict form, gave the jury the misimpression that its initial answers to Questions 1, 3, 5, 6, 7, and 8 were internally inconsistent and needed to be revised.  By failing to adequately explain that the verdict had been resubmitted to the jury because the answers to Questions 6, 7, and 8 were inconsistent with the award of damages in Question 11C, the district court failed to alleviate the jury's confusion as to why it was being asked to re-deliberate.  Moreover, in telling the jurors that "there should be consistency . . . between those findings," without further explanation, the district judge unwittingly indicated to the jury that its previous answers concerning liability on the federal law and IIED claims were incorrect because they were not consistent with each other.  The erroneous and incomplete directions following Question 8 in the verdict form compounded the problem.  The district judge's insistence that Question 9 regarding liability on the false arrest claim needed to be answered effectively operated as a instruction to the jury to answer "no" to Question 8, which was the only response to Question 8 that required the jury to proceed to Question 9.  In sum, in more than one way, the district court improperly sent

a message to the jurors that they got it wrong the first time. Defendants are entitled to a new trial.[4]

## B.  Qualified Immunity

We must also decide whether McIntosh and Prock are entitled to qualified immunity on the federal claims.  We apply the customary standards of review, namely de novo review as to the denial of qualified immunity raised in a renewed motion for judgment as a matter of law,[5] construing the evidence in the light most favorable to the non-moving party, and giving significant deference to the jury's verdict. *A.D. v. Cal. Highway Patrol*, 712 F.3d 446, 452–53 (9th Cir. 2013).

---

[4] On appeal, defendants assign error to the district court's denial of their motion in limine to exclude testimony by Coach Sinclair about prior incidents of student handcuffing at Sonora Elementary School.  In light of our ruling, we need not decide whether any error in admitting the evidence of previous handcuffings would itself warrant a new trial.

[5] The record reveals that defendants attempted to move for judgment as a matter of law before the jury began deliberating, but the district court delayed the matter, indicating that it "reserved that right" to defendants. Defendants' motion for judgment as a matter of law was eventually brought after the jury had rendered a verdict, and was therefore more akin to a motion under Rule 50(b), but the district court treated it as defendants' "reserved" motion under Rule 50(a), citing in its order, as the governing legal standard, only Rule 50(a).  Thus, contrary to C.B.'s assertion that defendants were precluded from bringing a Rule 50(b) motion by a failure to make a proper Rule 50(a) motion, *see Tortu v. Las Vegas Metro. Police Dep't*, 556 F.3d 1075, 1081–83 (9th Cir. 2009), we deem defendants' post-trial motion as a consolidated Rule 50(a) and 50(b) motion.  *See E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009) ("Rule 50(b) 'may be satisfied by an ambiguous or inartfully made motion' under Rule 50(a)," and it is given a "liberal interpretation" to avoid overly harsh results).

Qualified immunity analysis consists of two steps: (1) whether the facts the plaintiff alleges make out a violation of a constitutional right; and (2) whether that right was clearly established at the time the defendant acted. *Pearson v. Callahan*, 555 U.S. 223, 232, 236 (2009). We need not decide whether C.B.'s constitutional rights in fact were violated here, because in our view the officers' conduct did not violate a clearly established right. *See id.* at 243–44.

We begin with the officers' assertion of qualified immunity on C.B.'s Fourth Amendment unlawful custody claim. As the source of their authority to take C.B. into temporary custody, the officers invoked Cal. W&I § 625(a),[6] which they contend authorized them to take C.B. into custody if he was an out-of-control juvenile within the meaning of Cal. W&I § 601(a). Whether § 601(a) applies in this setting is unclear. Subsection 601(a) applies when a minor is "beyond the control" of "his or her parents, guardian, or custodian," but does not make reference to school officials, in contrast to § 601(b), which does. Nonetheless, because the term "custodian" in § 601(a) is ambiguous and California

---

[6] C.B. accuses defendants of post hoc rationalization, indicating that the statute was not referenced in the reports concerning this incident and was not mentioned during the depositions of Chief McIntosh and Officer Prock. The statute was, however, discussed in defendants' motion for summary judgment, and the issue of whether the statute provided a basis for qualified immunity was squarely before the district court in advance of trial. The district court, however, concluded that defendants had not presented evidence establishing Chief McIntosh and/or Officer Prock knew enough about C.B.'s medical condition to invoke Cal. W&I § 625. In making such ruling, the district court improperly confined its reading of the statute to subsection (c), which authorizes a warrantless seizure of a juvenile "found in any street or public place suffering from any sickness or injury which requires care, medical treatment, hospitalization, or other remedial care." Cal. W&I § 625(c).

courts have not squarely resolved the question, no clearly established law informed the officers that school officials were not "custodians" within the meaning of § 601(a). *See Fuller v. M.G. Jewelry*, 950 F.2d 1437, 1442–43 (9th Cir. 1991); *see also Pearson*, 555 U.S. at 231.

That leaves the question of whether a reasonable officer could have believed (even if mistakenly) that C.B. was beyond the control of school officials within the meaning of § 601(a). *See Fuller*, 950 F.2d at 1443. Even if we were to construe § 625(a)'s "reasonable cause" standard as requiring probable cause for such belief, as C.B. contends, the officers are entitled to qualified immunity. The officers were informed by school officials that C.B. (1) was out of control, (2) was "a runner," (3) had been "yelling and cussing," (4) had not taken his medications, and (5) could not remain at school any longer. No clearly established law would put a reasonable officer faced with these circumstances on notice that taking C.B. into temporary custody under § 625(a) was unlawful. *See Saucier v. Katz*, 533 U.S. 194, 202 (2001). Moreover, the officers investigated further by talking to C.B., but C.B. was unresponsive. No clearly established law at the time suggested that the officers were required to conduct additional investigation beyond talking to C.B. before they could rely on the information they received from school officials, particularly when a prolonged investigation might increase the risk of C.B. running away and onto a busy road, from which he was separated only by an unlocked gate.

In ruling on defendants' consolidated Rule 50(a) and 50(b) motion for judgment as a matter of law, the district court failed to conduct this second part of the qualified immunity analysis. With respect to plaintiff's unlawful seizure claim, the district court did not cite a single case in

which police officers were held to have violated the Fourth Amendment by transporting a disruptive child from a school to a guardian's home or place of business.[7] Moreover, in citing our decision in *Greene v. Camreta*, 588 F.3d 1011 (9th Cir. 2009), *vacated in part*, 131 S. Ct. 2020, *vacated in part on remand*, 661 F.3d 1201 (9th Cir. 2011), as support for applying the "special need" doctrine first announced in *N.J. v. T.L.O.*, 469 U.S. 325 (1985), the district court failed to recognize that the events at issue in this case transpired before *Greene* was decided.[8]

The district court also ignored precedent from other circuits indicating that handcuffing during the course of an otherwise lawful arrest ordinarily fails to state an excessive force claim. *See Brown v. Gilmore*, 278 F.3d 362 (4th Cir.

---

[7] The only authorities on which the district court relied did not deal with the situation in which a school official wants a student removed from campus, and the cases were themselves at odds concerning whether a single instance of misconduct is sufficient to indicate that a juvenile is "beyond control," within the meaning of Cal. W&I §§ 601 & 625. *See In re D.J.B.*, 96 Cal. Rptr. 146 (Cal. Ct. App. 1971); *In re David S.*, 91 Cal. Rptr. 261 (Cal. Ct. App. 1970).

[8] The "special need" doctrine involves a two-part inquiry: (i) whether the action at issue was justified at its inception; and (ii) whether the action as actually conducted "was reasonably related in scope to the circumstances which justified the interference in the first place." *T.L.O.*, 469 U.S. at 341. The dissent contends that the "special need" test governs. Even under the more demanding "reasonable cause" standard of Cal. W&I § 625(a), however, we conclude that the law was not clearly established concerning whether the officers could rely primarily on the representations of school officials in deciding to take custody of C.B., and thus, we need not decide whether the "special need" doctrine applies or whether it was satisfied. The dissent's reasoning that C.B.'s detention did not meet the second prong of the "special need" test reaches too far by deciding questions of fact more appropriately reserved for a jury.

2002); *Neague v. Cynkar*, 258 F.3d 504 (6th Cir. 2001); *Glenn v. City of Tyler*, 242 F.3d 307 (5th Cir. 2001). Indeed, no clearly established law suggests that handcuffing a juvenile when lawfully taking him into temporary custody violates the juvenile's Fourth Amendment rights, absent a showing that the handcuffs caused injury or that the officer ignored complaints about the handcuffs, neither of which C.B. alleged in this case. *See Hupp v. City of Walnut Creek*, 389 F. Supp. 2d 1229, 1232 (N.D. Cal. 2005) (citing *Wall v. County of Orange*, 364 F.3d 1107 (9th Cir. 2004); *LaLonde v. County of Riverside*, 204 F.3d 947 (9th Cir. 2000); *Palmer v. Sanderson*, 9 F.3d 1433 (9th Cir. 1993)).

Because the law was, and still is, not "clearly established" that handcuffing and driving a juvenile from school to a relative's place of business implicates Fourth Amendment rights, McIntosh and Prock are entitled to qualified immunity with regard to plaintiff's claims under 42 U.S.C. § 1983. *See Hope v. Pelzer*, 536 U.S. 730, 739–41 (2002) (the "state of the law" must have given "fair warning" to the officer that the conduct in question was unconstitutional).

## CONCLUSION

For the foregoing reasons, the verdict and judgment are vacated, and this matter is remanded for further proceedings. The district court is instructed to enter judgment as a matter of law in favor of individual defendants McIntosh and Prock as to C.B.'s claims under 42 U.S.C. § 1983 on the basis of qualified immunity. In light of our rulings, we do not address whether defendants are entitled to an offset of the amount

paid in settlement by the Sonora School District and Karen Sinclair.

**VACATED, REVERSED in part, and REMANDED**.

McKEOWN, Circuit Judge, concurring in part and dissenting in part:

I concur in the majority's decision to remand this case for a new trial.  I also concur in the remand of the state law claims.  I respectfully dissent from Part B, which holds that Officers McIntosh and Prock are entitled to qualified immunity on C.B.'s Fourth Amendment claims.  The facts demonstrate that C.B.'s prolonged detention was unconstitutional.  In light of existing precedent, the district court did not err in denying the motion for judgment as a matter of law premised on qualified immunity.

Three police officers arrived at the playground of Sonora Elementary School in response to a dispatch reporting an "out of control juvenile."  Upon arrival, the officers found C.B., an 80-pound 11-year-old child, seated calmly and silently on a bench, staring at the ground.  A school official whispered "Runner.  No medicine." and made corresponding hand gestures to the officers, but did not explain what medicine C.B. had failed to take or what it meant to be a "runner."  Indeed, some of his medicines were at the school, though no one bothered to check.  Based on this meager information, without making further inquiries, and after no more than five minutes of unsuccessfully attempting to engage C.B. in conversation, the officers ordered C.B. to stand up with his hands behind his back, handcuffed him, placed him in the

back of a police vehicle, and transported him while handcuffed to his uncle's business.

At trial the officers testified that they had no reason to believe C.B. had committed any crime or threatened anyone's safety, nor was there any evidence that the child was a danger to himself. It is undisputed that C.B. did not act out of control, did not make any attempt to run away, and was compliant throughout. Under these circumstances, C.B.'s prolonged detention was unreasonable, the standard set out by the Fourth Amendment as well as the Supreme Court in *New Jersey v. T.L.O.*, 469 U.S. 325 (1985). Imposing this standard on law enforcement agents is nothing new. Though responding to a school's request, police officers cannot escape the reasonableness standard when they intercede as law enforcement. The police are not surrogate school officials for managing internal school problems. The officers here may well have been genuinely motivated to assist the school in some way, but good intentions cannot trump established law.

The officers' focus on the meaning of the "reasonable cause" standard under California Welfare and Institutions Code § 625(a) is misplaced. That section is inapplicable on its face to C.B.'s scenario. Section 625(a) allows a peace officer who has "reasonable cause" for believing a minor fits into one of the categories described in § 601 to take the minor into temporary custody without a warrant. Both §§ 601(a) and (b) describe minors who "persistent[ly] or habitual[ly] refuse[] to obey . . . reasonable . . . orders"—§ 601(a) addresses disobedience towards "parents, guardian[s], or custodian[s]," while § 601(b) concerns disobedience towards "school authorities," where a school attendance review board or probation officer determines that available services are

insufficient to correct the minor's disobedience.**[1]**  Because Sonora Elementary School is not C.B.'s parent, guardian, or custodian under § 601(a),**[2]** and the requisite determination had not been made under § 601(b), the California welfare statute does not come into play.

Even if § 625(a) were applicable through § 601(a), the "reasonable cause" standard mirrors the "reasonableness" standard in *T.L.O.*, 469 U.S. at 341–43, and state precedents make clear that C.B. was not "beyond control."  The officers

---

**[1]** I agree with the district court that § 625(c), which authorizes the warrantless seizure of a juvenile in need of medical treatment or hospitalization, was not a legitimate basis for seizure.  Because that section is inapplicable, I also agree with the majority that § 625(a) should be the focus of our analysis.

**[2]** On its face, the term "custodian" does not apply to school officials. *See In re Rita M.P.*, 12 Cal. App. 3d 1057 (1970) (dealing with a custodianship relationship, where the custodian was a probation officer who had custody of the minor child while the child awaited placement in a foster home).  This point is buttressed by the grouping together of parents, guardians, and custodians in § 601(a), indicating that "custodian" should be narrowly construed to parallel the level of specificity of "parent" and "guardian."  *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 586 (2008) (noting that under the rule of ejusdem generis, "when a statute sets out a series of specific items ending with a general term, that general term is confined to covering subjects comparable to the specifics it follows").  Moreover, "school authorities" are specifically and separately addressed in § 601(b), which contains requirements and conditions not present in § 601(a).  If school authorities qualified as custodians under § 601(a), they would not need to make the determination required under § 601(b), rendering the latter provision superfluous. *United States v. 144,744 pounds of Blue King Crab*, 410 F.3d 1131, 1134 (9th Cir. 2005) ("It is an accepted canon of statutory interpretation that we must interpret the statutory phrase as a whole, giving effect to each word and not interpreting the provision as to make other provisions meaningless or superfluous.") (citations omitted).

had no evidence that there had been any persistent or habitual disobedient conduct on the part of C.B. A single act of defiance is ordinarily not enough to establish that a minor is beyond control under § 601(a) unless that single act is sufficiently serious. *See In re Bettye K.*, 234 Cal. App. 3d 143, 149 (1991) ("A single act in violation of parental authority is ordinarily insufficient, by itself, to establish a finding that a minor is beyond parental control within the meaning of Welf. & Inst. Code, § 601, subd. (a). . . .").

C.B.'s conduct—sitting silently on a schoolyard bench, even taken in conjunction with a dispatch to investigate an "out of control juvenile"—is incomparable to those single acts of defiance that have been deemed sufficiently serious under § 601(a) and hardly compares even to those that have been found insufficiently serious. *See, e.g.*, *In re D.J.B.*, 18 Cal. App. 3d 782, 786–87 (1971) (holding that leaving a parent's home without consent was not a sufficiently serious single act of defiance); *In re David S.*, 12 Cal. App. 3d 1124, 1128 (1970) (holding that lying about spending the weekend at a beach 40 miles from home but actually intending to go to Mexico and being picked up 600 miles away at the Mexican border was a sufficiently serious single act of defiance). Not surprisingly, the cases under § 601(a) deal with parents, guardians, and custodians, not school officials. Contrary to the majority's assertion, it is abundantly clear that the officers had no authority to proceed under California law because §§ 601 and 625 are inapplicable to C.B.'s situation.

Putting §§ 601 and 625 aside, the Fourth Amendment requires that seizures be objectively reasonable in light of the facts and circumstances. *Graham v. Connor*, 490 U.S. 386, 397 (1989). This inquiry requires a balancing of "the nature and quality of the intrusion on the individual's Fourth

Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Tennessee v. Garner*, 471 U.S. 1, 8 (1985) (internal quotation marks and citation omitted). In *T.L.O.*, the Supreme Court addressed how that balance should be struck in the context of a search conducted by a teacher or school official in the school setting. 469 U.S. at 328. Taking into consideration a school's special need to maintain an orderly educational environment and a teacher's lack of familiarity with the "niceties of probable cause," the Court held that school administrators acting on their own authority should be held to a standard more lenient than probable cause that focuses instead on the question of "reasonableness" according to the "dictates . . . of common sense." *Id.* at 341–43. The Court set out a twofold inquiry for determining the reasonableness of a school search: (1) whether the search was justified at its inception, and (2) whether the search as ultimately conducted was reasonably related in scope to the circumstances justifying the search in the first place. *Id.* at 341–42.

At a minimum, Officers McIntosh and Prock must be held to *T.L.O.*'s reasonableness standard, an issue the majority acknowledges "is a matter involving questions of fact more appropriately reserved for a jury," and thus should not be resolved by granting qualified immunity. Although *T.L.O.* was decided in the context of a school search, that standard has since been applied to school seizures. *See, e.g.*, *Doe v. State of Hawaii Dep't of Educ.*, 334 F.3d 906, 909 (9th Cir. 2003) ("In applying the Fourth Amendment in the school context, the reasonableness of the seizure must be considered in light of the educational objectives [the school official] was trying to achieve.") (citing *T.L.O.*, 469 U.S. at 342); *Wallace v. Batavia Sch. Dist. 101*, 68 F.3d 1010 (7th Cir. 1995); *Edwards v. Rees*, 883 F.2d 882 (10th Cir. 1987). *T.L.O.* itself

also involved school authorities acting alone, and the Court expressed "no opinion" as to the appropriate standard to be applied to police conduct in the school setting. *Id.* at 347 n.7. But the rationale behind *T.L.O.*—particularly the need to accommodate teachers' unfamiliarity with the probable cause standard—indicates that the participation of police officers can only raise the standard of suspicion required. In short, *T.L.O.* set a floor of reasonableness.

Some courts have held that *T.L.O.*'s reasonableness standard applies to school seizures by law enforcement officers, *see, e.g.*, *Grey ex rel. Alexander v. Bostic*, 458 F.3d 1295 (11th Cir. 2006),[3] while others have applied probable cause to police conduct in the school setting, *see, e.g.*, *Picha v. Wielgos*, 410 F.Supp. 1214, 1219–21 (N.D. Ill. 1976). We need not bridge this divide. As counsel for Officers McIntosh and Prock acknowledged at oral argument, the appropriate standard for police officers in the school setting is no lower than *T.L.O.*'s reasonableness standard for school administrators.

Applying *T.L.O.*'s twofold reasonableness inquiry, C.B.'s seizure was justified at its inception. Officers McIntosh and Prock were dispatched to investigate an "out of control juvenile." They reasonably relied on the school official's representation that C.B. was a runner and had not taken his

---

[3] In *Grey*, the Eleventh Circuit affirmed the district court's denial of summary judgment on the basis of qualified immunity. The Eleventh Circuit explained that *T.L.O.*'s reasonableness standard applied to a deputy sheriff who detained and handcuffed a nine-year-old student for under five minutes after she allegedly threatened to hit her teacher in gym class, that the deputy sheriff violated the student's Fourth Amendment rights, and that the deputy sheriff was not entitled to qualified immunity because the violation was obvious. *Id.* at 1304–07.

medication when they initially detained C.B. and attempted to engage him in conversation. But once they discovered that C.B. was simply sitting silently on a schoolyard bench, they could no longer rely solely on the school official's unexplained allegation that C.B. was beyond control and her request to remove C.B. from school—any continued detention of C.B. was not "reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* at 341. Aside from the fear that C.B. might run away—a fear I find objectively unpersuasive in light of Officers McIntosh and Prock's own testimony at trial that C.B. never attempted to run, nor would he have been able to while surrounded by four standing adults—the officers do not cite any concrete objectives or interests advanced by C.B.'s prolonged detention. Nor did the officers make any basic assessment of the situation once they arrived on the scene—by, for instance, asking the school official what C.B. had done to prompt the dispatch to begin with—which might have uncovered facts on which they could make a judgment.[4] Without more, a school official's request for the officers to intercede and a disabled 11-year-old child's refusal to talk to the officers is hardly a reasonable justification for an extended detention. The officers' conduct was objectively unreasonable and was "excessively intrusive in light of the age . . . of the student and the nature of the infraction." *Id.* at 342. They had no authority to proceed under either California law or the Fourth Amendment.

Because C.B.'s seizure was unconstitutional, I turn to the second prong of the qualified immunity analysis, namely

---

[4] The majority's lengthy recitation of C.B.'s history at the school and information known by school officials is, of course, irrelevant since the officers knew none of these circumstances.

whether C.B.'s constitutional right was "clearly established" at the time of the officers' misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). In my view, it would have been "clear to a reasonable officer" in September 2008 that C.B.'s seizure was "unlawful in the situation [Officers McIntosh and Prock] confronted." *Saucier v. Katz*, 533 U.S. 199, 202 (2001).

The majority is mistaken that *T.L.O.* has never been applied to seizures. The officers had fair warning based on cases in the Ninth and other circuits that *T.L.O.*'s reasonableness standard applied to their conduct, meaning that C.B.'s seizure was required to be justified at its inception, and the seizure ultimately effected was required to be related in scope to the circumstances justifying it. *See, e.g.*, *Doe*, 334 F.3d at 909 (citing *T.L.O.* and holding that, in the school context, "the reasonableness of the seizure must be considered in light of . . . educational objections"); *Grey*, 458 F.3d at 1304–06 ("apply[ing] the reasonableness standard articulated in [*T.L.O.*] . . . to school seizures by law enforcement officers"); *Wallace*, 68 F.3d at 1012–14 (noting that "several circuit courts have relied upon [*T.L.O.*] to find that seizures of students by teachers also come within the ambit of the Fourth Amendment" and concluding that "in the context of a public school, a teacher or administrator who seizes a student does so in violation of the Fourth Amendment . . . when the restriction of liberty is unreasonable under the circumstances then existing and apparent"); *Edwards*, 883 F.2d at 884 (citing *T.L.O.* for the proposition that "courts have always sought to accommodate both the interests protected by the Constitution and the interests in providing a safe environment conducive to education in the public schools" when applying the Fourth Amendment in the school context).

Even without reference to these cases, an official can have fair warning that his conduct is unconstitutional when that violation is obvious. *See United States v. Lanier*, 520 U.S. 259, 271 (1997) ("[A] general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] been previously held unlawful.") (internal quotation marks and citations omitted). The prolonged detention of a compliant disabled 11-year-old child sitting on a schoolyard bench based on the paltry information relied on by Officers McIntosh and Prock is an obvious violation of the Fourth Amendment's general proscription against unreasonable seizures.